**Donald M. BERKOVITZ, et al.,
Plaintiffs, Appellants,**

v.

**HOME BOX OFFICE, INC., et al., Defendants, Appellees.**

No. 95–2335.

United States Court of Appeals,
First Circuit.

Heard June 6, 1996.
Decided July 22, 1996.

Joseph L. Kociubes, with whom Peter J. Mancusi and Bingham, Dana & Gould, Boston, MA, were on brief, for appellants.

Kim J. Landsman, with whom Carin G. Reynolds, Patterson, Belknap, Webb & Tyler LLP, Andrea J. Pollack, New York City, Cornelius J. Moynihan, Jr., and Peabody & Brown, Boston, MA, were on brief, for appellee Home Box Office, Inc.

Cornelius J. Moynihan, Jr., with whom Peabody & Brown, Boston, MA, Joseph J. Santora, Leonard F. Lesser, and Schneck Weltman Hashmall & Mischel LLP, New York City, were on brief, for appellees Viacom International, Inc. and MTV Networks.

Before SELYA, CYR and BOUDIN, Circuit Judges.

SELYA, Circuit Judge.

In this appeal, plaintiff-appellant Donald M. Berkovitz challenges the district court's spontaneous entry of judgment in favor of the defendants Home Box Office, Inc. (HBO) and Viacom International, Inc. (Viacom).[1] Although we applaud the district court's innovative case management and its Briarean efforts to refine the issues for trial, we believe that in one crucial respect the court went awry. Consequently, we vacate the judgment and remand for further proceedings.

## I. FACTUAL PREDICATE

■ We frame the facts in the aspect most beneficial to the party against whom the district court entered judgment, consistent with record support. *See, e.g., Quaker State Oil Refining Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1513 (1st Cir.1989).

---

1. We omit particularized reference to two parties who necessarily stand or fall with parties whom we have already mentioned. The omitted parties are plaintiff KDK, Inc. (an inactive corporation controlled by Berkovitz) and defendant MTV Networks (a wholly-owned subsidiary of Viacom). Notwithstanding this exercise of literary license, our opinion is binding upon all the litigants.

In early 1984, Berkovitz hit upon an idea for a cable television channel. He dubbed this concept "The Entertainment Network" (or, for short, "the TEN plan"). The concept envisioned a round-the-clock commercial television channel highlighting lesser-known musical and comedic acts supplemented by talk shows, movies, and other staples. The concept embodied interactive features through which the viewing audience could participate in contests and offer programming suggestions telephonically.

In February 1985, Berkovitz offered a copy of the TEN plan to an HBO vice president, Larry Carlson, who accepted the offer. He then sent the document (which, like all other copies of the TEN plan mentioned herein, bore the legend "confidential" on its cover page) to Carlson. Approximately three months later, HBO disclaimed any interest and returned the submission (although Berkovitz intimates that HBO retained a copy). In July 1987, Berkovitz attempted to interest Viacom in the TEN plan. The chairman's secretary suggested that he forward a copy to Viacom. He claims to have done so on the express condition that the submission was "for [the chairman's] eyes only." He also claims to have furnished extra copies at Viacom's request and to have met with an MTV vice-president, Lee Masters, anent the proposal. Although Masters "raved" about certain aspects of the plan, the meeting came to naught.

Little daunted, Berkovitz resumed his courtship of HBO. During the fall of 1987 he met with Carlson, who, Berkovitz maintains, perused the TEN plan, praised it, agreed to keep its contents in confidence, and led him to believe that HBO would help launch the new enterprise and share the fruits with him. Despite these encomia, and several subsequent telephone conversations in the same vein, HBO never followed through.[2]

HBO inaugurated "The Comedy Channel" in November of 1989. Viacom shortly followed suit with "Ha! The Comedy Network." Late in 1990 the two merged to become "Comedy Central." Berkovitz insists that these offerings all drew their inspiration from the TEN plan, and that they did so in blatant disregard of his proprietary rights.

## II. TRAVEL OF THE CASE

The procedural aspects of this litigation are of decretory significance. We divide our account into two parts.

### A. *Initial Proceedings.*

Invoking diversity jurisdiction, 28 U.S.C. § 1332, Berkovitz filed suit in federal district court on January 28, 1991. Judge Skinner drew the case. In the complaint, the plaintiff alleged that HBO and Viacom pirated his concept without compensating him, unjustly enriched themselves at his expense, breached implied-in-fact contracts to pay him if they used the TEN plan to productive ends, and committed unfair trade practices. The defendants denied these allegations.

The novelty (or lack thereof) of the TEN plan and its constituent elements soon became a protuberant bone of contention. The defendants, positing that New York's substantive law governed, maintained that Berkovitz had to prove the novelty of his idea in order to recover under any actionable theory of the case. Berkovitz, positing that the substantive law of Massachusetts governed, attempted to parry this thrust on two levels: he asserted both that his idea was in fact novel, and that in all events a plaintiff whose idea was misappropriated in contravention of an implied-in-fact contract need not prove novelty in order to recover.

In time, the defendants moved for summary judgment. Judge Skinner considered the parties' arguments and reserved decision. In a rescript dated May 18, 1994, he held (1) that Massachusetts law supplies the rule of decision, (2) that Massachusetts does not require a showing of novelty when the plaintiff alleges the existence of a contractual relationship, and (3) that the defendants' motions for summary judgment should therefore be denied on all but the unfair trade practices

---

**2.** Not surprisingly, Carlson disputes this account. He testified during a deposition that he found both Berkovitz and the TEN plan lacking in focus; hence, he refrained from making any commitments.

claim. The court entered an appropriate order.

### B. *The Pretrial Conferences.*

After Judge Skinner elected senior status, many of his cases were redrawn. Judge Keeton assumed responsibility for this case in mid–1994. Although the defendants moved for reconsideration of the earlier denial of *brevis* disposition, Judge Keeton did not act upon these motions. He instead convened a series of pretrial conferences in a commendable effort to bring matters to a head. During the last four conferences (all of which took place in 1995), the judge concentrated on clarifying and delimiting the issues to be tried. Because the events that transpired at these conferences shed considerable light on this appeal, we set out a brief chronology.

1. *The March 21 Conference.* The first of the four conferences focused primarily on the parties' agreement to bifurcate the trial, separating the issues of liability and damages. But Judge Keeton also seized this opportunity to instruct the parties to spell out their legal theories (avoiding forensic jargon), and directed them to develop a verdict form suitable for submission to a jury.[3]

2. *The April 27 Conference.* At the next conference the parties wrangled over a proposed verdict form. The debate led Judge Keeton to remark that "we're going to have to get specific" about what elements of the TEN plan were "substantially used" by the defendants. The judge explained that this degree of particularization would assist in "structuring the claims and defenses so that I can understand them, so the jury can understand them, [and] so that [the litigants] can understand each other."

3. *The June 1 Conference.* At the third conference the judge cautioned that he would not allow the jury to consider "a fuzzy claim" and urged the plaintiff's lawyer to "communicat[e] to me clearly . . . your legal and factual theory." After some additional discourse (during which the defendants unsuccessfully sought leave to file fresh motions for summary judgment), plaintiff's counsel reformulated his position. He pledged that he would prove (1) an implied agreement between Berkovitz and each of the defendants for confidential disclosure of the TEN plan, and (2) the defendants' appropriation of the plan in derogation of this agreement. The court reiterated its concern that this reformulation did not enumerate which elements of the plan were novel and which were used by the defendants. In addition, the court asked the plaintiff to list the legal elements of his implied-in-fact contract claim, and plaintiff's counsel agreed to try again.

4. *The July 18 Conference.* The plaintiff's outright abandonment of any cause of action based on the putative novelty of any of the elements contained in the TEN plan dominated the early stages of the final conference. Novelty aside, the defense maintained that the plaintiff still had not specified the elements of his remaining implied contract claim.[4] The court reaffirmed its desire that Berkovitz state his cause of action with particularity. Noting that Berkovitz's proposed jury instructions, if given, would require the jury to find that HBO and/or Viacom made "substantial use" of the TEN plan, the court asked Berkovitz to specify what this portended.

More discussion ensued, but the judge remained dissatisfied; he reminded Berkovitz's counsel that he had the authority to require a plaintiff to state with particularity the theory

---

3. In the course of this conference, plaintiff's lead counsel made his first attempt to spell out his implied contract theory. He suggested that there are several elements: "one is, did Mr. Berkovitz come up with the idea? . . . Two, did he submit it to the defendants? Three is, did they use it? . . . Four is, did he submit it . . . to them in a context in which one can imply a promise to pay for it if they use it? . . . And then if [the jurors] answer all of those correctly, I would say under that one theory of the case, then you go to damages . . . ."

4. Following the parties' lead, we use "implied contract" and words of like import as a rubric to cover not only plaintiff's implied contract claim but also his embedded claim for breach of fiduciary duty. Both claims have a common denominator: they require proof of an agreement or duty to hold Berkovitz's idea in confidence, and to compensate him for its unauthorized use.

underpinning his claim, and warned that he might dismiss the case because Berkovitz had failed to comply with the particularization orders. The defendants moved orally for summary judgment on the ground that all the elements of the TEN plan were in the public domain. The court expressed no interest in strolling down this road, and the oral motions languished.

In a last-ditch effort to satisfy the court's demands, Berkovitz's attorney again attempted to articulate his theory of the case. The lawyer delineated what he termed Berkovitz's position "from day one": Berkovitz gave the defendants copies of the TEN plan under circumstances in which a reasonable person would expect compensation if they (or either of them) used his work product. Thus, if a defendant had made some beneficial use of some part of that document, Berkovitz would be entitled to relief. The court described this iteration of Berkovitz's theory as postulating an "all factors" approach because it did not differentiate among the elements of the TEN plan (e.g., it did not single out which elements the plaintiff claimed had been misappropriated and used). After expressing its belief that the approach probably was "incorrect as a matter of law," the court entered an interlocutory judgment for the defendants but gave Berkovitz "time for filing something more."

**5. The Court's Final Order.** Berkovitz—who apparently believed that the court had entered the interlocutory judgment either as a sanction for failure adequately to particularize his claim or because it found the "all factors" approach legally infirm—moved for reconsideration. The court denied the motion and entered final judgment. *See Berkovitz v. HBO,* 1995 WL 791939, at *10 (D.Mass. Oct. 23, 1995). In this order the court clarified the basis on which the judgment rested; in its view, Berkovitz's claim lacked factual grounding. *See id.* at *5. Consequently, the court terminated the case on substantive grounds. *See id.* at *9.

## III. DISCUSSION

Our analysis proceeds in three steps. First, we examine the lower court's final order and explain why we deem that order to

be a species of sua sponte summary judgment. Next, we delineate the legal standards that pertain to such judgments. Finally, we dispose of the appeal.

### A. *Characterizing the District Court's Final Order.*

■ We find no fault with the judge's decision to convene a series of pretrial conferences devoted largely to refining the issues and ascertaining which issues were fit for the jury's consumption. Federal district courts enjoy wide discretion in their crafting of the pretrial process, *see, e.g., Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438, 1450 (10th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *Jensen v. Frank,* 912 F.2d 517, 524 (1st Cir.1990), and requiring parties to particularize claims or defenses falls well within the compass of that discretion. In a related vein, courts may use case management tools to advance the important purpose of affording "the opposing party fair notice of the claims asserted against him and the grounds on which those claims rest." *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1171 (1st Cir.1995).

In this instance, the court made adroit use of its powers and succeeded in winnowing the plaintiff's claims until only one claim remained—the implied contract claim premised on the "all factors" approach. There are three possibilities that might explain why the court entered judgment in the defendants' favor on this last claim: (1) the claim may have depended upon a flawed legal theory, or (2) it may have been stated too loosely (in defiance of the court's particularization orders), or (3) it may have lacked a sufficient evidentiary predicate. Though the court criticized the "all factors" approach in various respects at various times, careful perscrutation of the final order rules out two of these possibilities. As to legal insufficiency, the court stated that it had "[a]ssum[ed], without deciding, that [the "all factors" approach upon which Berkovitz's implied contract claim depends] is indeed a correct interpretation of the law in Massachusetts." *Berkovitz, supra,* at *5. As to the particularization orders, the court vouchsafed that the plaintiff did not violate these orders by fail-

ing to furnish a more precise statement of his implied contract claim. *See id.* at *9.

This leaves the third possibility: evidentiary insufficiency. Unlike the other possibilities, that explanation is strengthened by the language of the final order. The court wrote "that the plaintiff has provided no evidence from which a jury could decide ... that in this case factual circumstances supporting ... a duty [of confidentiality] arose at some point during the negotiations of the parties." *Id.* at *5. Along the same lines, the court added that "[a] jury could not reasonably find, on this evidence, that factual conditions prerequisite to a contractual or fiduciary duty existed in this case." *Id.* Consequently, Berkovitz's implied contract claim did not "survive[ ] examination on the merits." *Id.* at *9.

We will not paint the lily. Since "the district court speaks to us primarily through its decrees," *Advance Fin. Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 26 (1st Cir.1984), the final order itself is the most likely source of enlightenment in our quest to understand its nature. Here, the order, fairly read, discounts the other possibilities and disposes of the plaintiff's implied contract claim on a substantive ground: lack of evidence. Accordingly, we are constrained to characterize the court's action as a spontaneous grant of summary judgment rather than as a dismissal for either legal insufficiency or want of compliance with case management orders.

### B. *Elucidating the Applicable Legal Standards.*

■■■ It is apodictic that district courts have the power to grant summary judgment sua sponte. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Stella v. Tewksbury*, 4 F.3d 53, 55 (1st Cir.1993); *Jardines Bacata, Ltd. v. Diaz–Marquez*, 878 F.2d 1555, 1560 (1st Cir.1989). Properly deployed, that power can complement the courts' case management authority. After all, pretrial conferences aid district courts in "the formulation and simplification of the issues, including the elimination of frivolous claims or defenses." Fed.R.Civ.P. 16(c)(1). Since this process is designed to promote efficiency and conserve judicial resources, *see In re Two Appeals*, 994 F.2d 956, 965 (1st Cir.1993), "[t]here is no reason to require that [the elimination of non-trialworthy claims] await a formal motion for summary judgment." Fed.R.Civ.P. 16(c)(1) advisory committee's note to 1983 amendment; *accord Aetna Cas. & Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1568 (1st Cir.1994). Thus, when "the pretrial conference discloses that no material facts are in dispute and that the undisputed facts entitle one of the parties to judgment as a matter of law," *Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir.1985), the court may dispose of the entire case by granting summary judgment sua sponte.[5] *See Capuano v. United States*, 955 F.2d 1427, 1432 (11th Cir.1992); *Portsmouth Square*, 770 F.2d at 869.

■■■ Though a district court may enter summary judgment sua sponte at, or in consequence of, a pretrial conference, the court must ensure that the targeted party has an adequate opportunity to dodge the bullet. To this end, we have placed two conditions on unbesought summary judgments. First, a district court ordinarily may order summary judgment on its own initiative only when discovery is sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts. *See Stella*, 4 F.3d at 55; *Jardines Bacata*, 878 F.2d at 1561. Second, the court may enter summary judgment sua sponte only if it first gives the targeted party appropriate notice and a chance to present its evidence on the essential elements of the claim or defense. *See Celotex*, 477 U.S. at 326, 106 S.Ct. at 2554; *see also Jardines Bacata*, 878 F.2d at 1561 (" 'Notice' in this context means that the losing party ... received a fair opportunity to put its best foot forward.").

These strictures are not peculiar to sua sponte summary judgments, but, rather, mir-

---

5. A district court also may grant partial summary judgment sua sponte, removing some (but fewer than all) of the parties' claims or defenses from the case. *See, e.g., Hubbard v. Parker*, 994 F.2d 529, 530 (8th Cir.1993); *National Expo., Inc. v. Crowley Maritime Corp.*, 824 F.2d 131, 133 (1st Cir.1987).

ror the general principles that govern all motions for summary judgment. *See Stella,* 4 F.3d at 56 (noting that "it is well settled in this circuit that all summary judgment proceedings, including those initiated by the district judge, will be held to the standards enunciated in Rule 56 itself"); *Quaker State,* 884 F.2d at 1513 (explaining that the district court's power to order summary judgment on its own initiative must be exercised "according to the rigorous protocol of Rule 56"). This means, of course, that a nisi prius court must give the targeted party at least ten days within which to proffer affidavits or other evidence in response to the court's specific concerns. *See Stella,* 4 F.3d at 56.

 Appellate review is equally unaffected by the spontaneous nature of the trial court's action. As with any other grant of summary judgment, the court of appeals affords plenary review to a decision granting sua sponte summary judgment, and reads the record in the light most hospitable to the targeted party. *See Quaker State,* 884 F.2d at 1513.

### C. *Applying the Standards.*

 These standards inform the disposition of this appeal. Having scoured the record, we believe that the district court failed to give the plaintiff adequate notice of the basis for the action that the court ultimately took, and that, therefore, the judgment cannot stand. We explain briefly.

 When a court charts a procedural route, lawyers and litigants are entitled to rely on it. A court cannot alter its bearings mid-course without signalling the impending change to the parties. *See Foster–Miller, Inc. v. Babcock & Wilcox,* 46 F.3d 138, 148–49 (1st Cir.1995) (pointing out that this principle is especially pertinent "[w]hen judges elect on their own initiative to use innovative methods in an effort to accelerate the progress of a case"); *Stella,* 4 F.3d at 55–56 (applying this principle to a sua sponte summary judgment). Here, the judge obviously understood the rule, *see Berkovitz, supra,* at *2 (acknowledging the court's obligation to afford "an opportunity for counsel opposing

the judgment to proffer all relevant and admissible evidence"), and apparently thought that he had honored it. *See id.* at *1 (describing the particularity-of-claim orders as requiring Berkovitz "to proffer admissible evidence sufficient to support the findings necessary to satisfy the elements of [his] legal theory"); *id.* at *5 (stating that Berkovitz was "given an opportunity to proffer any additional evidence that might be material"). Yet the record simply does not bear out the court's recollection.

One part of the problem relates to the particularity-of-claim orders. The court did not reduce those orders to writing, but delivered them *ora sponte* at the pretrial conferences that we have chronicled. Nonetheless, the conferences took place in the presence of a court reporter and transcripts now have been prepared.[6] Whatever the court's intentions, its transcribed words do not require the plaintiff to proffer evidence of the existence of the implied contracts.

Another part of the problem is that the district court appears to have changed course without giving the targeted party sufficient forewarning. When the court informed the plaintiff at the penultimate (June 1) conference that it might enter an adverse judgment, it linked this possibility not to evidentiary insufficiency but to the plaintiff's failure satisfactorily to comply with the particularity-of-claim orders. *See id.* at *3. At the last conference (July 18) the court reinforced this linkage by discussing its entry of an interlocutory judgment in tandem with its comments on the plaintiff's inability to articulate avenues of legal relief beyond the "all factors" approach. *See, e.g., id.* In its written opinion, however, the court veered in a different direction. It explained that the claim predicated on the "all factors" approach would not fly because "the plaintiff has provided no *evidence* from which a jury could decide, under any plausible interpretation of Massachusetts cases, that in this case *factual circumstances* supporting such a duty [of confidentiality] arose at some point during the negotiations of the parties." *Id.* at *5 (em-

---

6. While the four conferences listed in our chronology were on the record, the court convened at least one other conference (November 21, 1994) for which no transcript has been supplied. The clerk's notes on the docket sheet regarding this conference are unilluminating.

phasis supplied). Prior to making this ruling, the court had neither informed Berkovitz that it was considering a judgment based on evidentiary insufficiency nor invited him to marshal and present his proof in respect to the existence *vel non* of an implied contract.[7] To the contrary, the court's pre-ruling statements pointed in the opposite direction. We cite two examples. At the June 1 conference plaintiff's counsel strove to embellish the elements of his client's implied contract claim. The court interrupted him, stating: "I don't want to talk about the proof at this point. I just want to talk about the legal elements...." The second example is drawn from the July 18 semble; the court's declaration on this occasion that the plaintiff's claim was "incorrect as a matter of law" tended to render any proffer of evidence supporting that claim nugatory.

The question that confronts us is not whether the "all factors" approach is (or is not) legally sound. Similarly, the question is not whether there is (or is not) adequate evidence in the record to defeat summary judgment on the "all factors" approach. The question, rather, is whether the court gave the plaintiff a meaningful opportunity to cull the best evidence supporting his position, and to present that evidence, together with developed legal argumentation, in opposition to the entry of summary judgment. *See Stella,* 4 F.3d at 55; *Bonilla v. Nazario,* 843 F.2d 34, 37 (1st Cir.1988). On this record, we think that the opportunity—if one existed—was too poorly defined.[8]

Nor are we comfortable shifting the blame for the apparent miscommunication to the plaintiff. To be sure, this court from time to time has refused to permit appellants to take advantage of supposed oversights that had not been called to the district court's attention by way of a timeous motion to reconsider. *See, e.g., United States v. Schaefer,* 87 F.3d 562, 570 n. 9 (1st Cir.1996); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 678 (1st Cir.1995); *VanHaaren v. State Farm Mut. Auto. Ins. Co.,* 989 F.2d 1, 4–5 (1st Cir.1993). But here, the plaintiff filed a motion to reconsider, raising all the grounds that were apparent at the time. It was not until the district court ruled on the reconsideration motion that the spotlight suddenly swung to evidentiary insufficiency. While the plaintiff theoretically might have filed a *second* motion for reconsideration at that time, the appeal period was running; and, moreover, we are reluctant to fault a suitor who, like Berkovitz, chooses not to ask a trial court more than once to reconsider an adverse decision. Discretion, after all, is often the better part of valor.

We need go no further. It may be that, in the final analysis, the plaintiff cannot muster enough evidence to ward off a properly advertised summary judgment—but he is entitled to make the attempt. Since the record fails to show that Berkovitz had a meaningful opportunity to do so, the district court's sua sponte entry of summary judgment cannot stand.

*The judgment is vacated, and the case is remanded to the district court for further proceedings consistent with this opinion. Costs in favor of the plaintiff.*

---

7. We note that all parties initially seem to have assumed that the trial court did not premise the sua sponte judgment on a dearth of evidence. The plaintiff's motion for reconsideration makes manifest Berkovitz's belief that the court defenestrated the case either as a sanction or because the "all factors" approach failed as a matter of law. By the same token, the defendants' oppositions to that motion did not attempt to justify the judgment on the ground that there were evidentiary deficiencies related to the plaintiff's proof of one or more contractual relationships.

8. There are four reasons why it is not a satisfactory answer to suggest that the plaintiff had an opportunity to proffer this evidence in connection with the defendants' original Rule 56 motions. First, the defendants forswore any reliance on the insufficiency of such evidence when they filed those motions. Second, Judge Skinner neither focused on nor purported to decide whether the plaintiff could prove the existence of one or more implied contracts, but, rather, assumed that the defendants had entered into such contracts. Third, the contours of the case thereafter changed dramatically, and Judge Keeton explicitly declined to rule on the defendants' pending motions to reconsider Judge Skinner's order. *See Berkovitz, supra,* at *3. Finally, the defendants' reconsideration motions (like their original Rule 56 motions) also assumed the existence of the requisite contractual relationship.