# United States Court of Appeals
## For the First Circuit

---

No. 06-1925

JOSE SANCHEZ; NILSA IRIZARRY; CONJUGAL PARTNERSHIP SANCHEZ-
IRIZARRY, d/b/a, Laboratorio Clinico Irizarry Guash; DELMA
RODRIGUEZ; WILMER ROLDAN; CONJUGAL PARTNERSHIP ROLDAN-RODRIGUEZ,
d/b/a Laboratorio Salimar; MAITE ROLON-BALSEIRO; CESAR DEL-VALLE-
VAGUE; CONJUGAL PARTNERSHIP DEL-VALLE-ROLON, d/b/a Laboratorio
Clinico Rolon; OIM ENTERPRISES, INC., d/b/a Laboratorio Clinico
Ramos; ELBA RIVERA-MARTINEZ; CONJUGAL PARTNERSHIP MELENDEZ-
RIVERA; JOSE ZAYAS; ANA HERNANDEZ-RIVERA; CONJUGAL PARTNERSHIP
ZAYAS-HERNANDEZ; FRANCES GUTIERREZ-MARTINEZ; CONJUGAL PARTNERSHIP
GARRATON-GUTIERR; NESTOR ALLENDE-ORTIZ; ROSA ASPARO-PLANA;
CONJUGAL PARTNERSHIP; ALLENDE-ASPARO; MEDICAL GERIATRICS AND
ADMINISTRATIVE SERVICES, INC.; OUTPATIENT ADMINISTRATIVE
SERVICES, INC.; JOSE E. VARELA-ROSARIO; MIGDALIA QUILES-
RODRIGUEZ; CONJUGAL PARTNERSHIP VARELA-QUILES, d/b/a Farmacia San
José, d/b/a Farmacia De Aqui; ANA DELIA MARRERO; CONJUGAL
PARTNERSHIP TORRES-MARRERO, d/b/a Farmacia San Antonio; ALICIA
FELIBERTI-IRIZARRY; GUILLERMO J. FERNANDEZ; ELIZABETH SANCHEZ DE
LEON; CONJUGAL PARTNERSHIP RUIZ-SANCHEZ; LYDIA AYALA-DIAZ; JULIA
NAVEIRA; CONJUGAL PARTNERSHIP; VAZQUEZ-NAVEIRA; LUIS CARMELO
ALAMO CRUZ; CONJUGAL PARTNERHSIP ALAMO-CRUZ; JOSE WILLIAM
VAZQUEZ; ISOLINA RUIZ; JOSE VEGA; CONJUGAL PARTNERSHIP VEGA-RUIZ;
FRANCES MATOS-ORTIZ; WILFREDO BURGOS SANTIAGO; CONJUGAL
PARTNERSHIP BURGOS-MATOS; JOREALIS VIGO-GONZALEZ; AYMETTE VIGO-
GONZALEZ; LENDIS OJEDA-ALEMANY; KARLA OJEDA-ALEMANY; DANIEL
AQUINO RIVERA; DORIS MIRANDA RAMOS; CONJUGAL PARTNERSHIP AQUINO-
MIRANDA; ALEJANDRA OJEDA-ALEMANY; DANIERIC AQUINO-MIRANDA; DARRYL
AQUINO-MIRANDA; EDGARDO RODRIGUEZ-MARRERO; ROY BROWN; SAMMY
GARAU-DIAZ; KETTY DIAZ-GARCIA; AEDNA MARTINEZ-LAZU; ANDRÉS
ROMERO-DEST; ANA I. RODRIGUEZ-MARRERO; DAISY MORALES-PEREZ;
CARMEN ORTIZ-ROQUE

Plaintiffs, Appellants,

v.

TRIPLE-S MANAGEMENT, CORP.; TRIPLE-S, INC.; SEGUROS TRIPLE S,
INC.; SEGUROS DE VIDA TRIPLE-S, INC., SSS; INTERACTIVE SYSTEMS,
INC.; TRIPLE-C, INC.; ACCESSO-SALUD, INC.; MC-21 CORPORATION; CPA
RAMON M. RUIZ-COMAS; MIGUEL VAZQUEZ-DEYNES; CRISPULO RIVERA-
OFRAY; MD BELISARIO MATTA; MD FERNANDO L. LONGO; MD WILMER

RODRIGUEZ-SILVA; MD FERNANDO YSERN-BORRAS; MD EMIGDIO BUONOMO; MD ANGEL W. HERNANDEZ-COLÓN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Circuit Judge,

Stahl, Senior Circuit Judge,

and Howard, Circuit Judge.

Cherie K. Durand, with whom Paul H. Hulsey, Reynaldo Quinones, Hulsey Litigation Group, LLC and G. Robert Blakey were on brief, for appellants.

Gael Mahony, with whom Holland & Knight, LLP, Salvador Antonetti-Zequeira, César T. Alcover-Acosta, José L. Ramírez Coll, and Fiddler, González & Rodríguez were on brief, for appellees.

Eduardo A. Zayas-Marxuach, with whom Roberto C. Quiñones-Rivera and McConnell Valdés were on brief, for appellee, MC-21 Corporation.

June 13, 2007

**HOWARD**, <u>Circuit Judge</u>. The plaintiffs appeal from the entry of summary judgment for the defendants on claims asserting violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 <u>et seq.</u> (2000) ("RICO"). We affirm.

## I.

The plaintiffs commenced this suit as a putative class action, purporting to represent, among others, providers of medical products and services covered under policies issued or administered by the defendants, as well as the subscribers to those policies. The defendants include a number of insurance companies and similar businesses, such as claims administrators, who allegedly joined together with a number of others in a RICO "enterprise." 18 U.S.C. § 1961(4). The enterprise has allegedly engaged in efforts to "acquire control" of, "capitalize," and "convert" the assets of Triple-S, Inc., a now-defunct insurance company which, the plaintiffs say, had restricted the use of those assets to charitable purposes.[1]

The complaint asserted twelve numbered counts, each setting out a separate RICO violation in the form of a different

---

[1]With the exception of MC-21 Corporation, the defendant entities are subsidiaries of defendant Triple-S Management Corporation ("Triple S"), a holding company created when Triple-S, Inc. was reorganized. MC-21, for its part, is under contract with the defendant insurers to serve as the exclusive manager of the prescription drug benefits they provide; the plaintiffs allege that the other members of the enterprise "have a proprietary economic interest in MC-21, either directly, or indirectly."

scheme. In relevant part, these alleged schemes have enriched the enterprise by overcharging subscribers and underpaying providers for medical products and services that were covered under insurance policies issued by the defendant insurers. To carry out these schemes, the defendants have allegedly made a number of mailings in violation of the mail fraud statute, 18 U.S.C. § 1341, and transmissions in violation of the wire fraud statute, id. § 1343. One of the schemes has also allegedly relied on extortion in violation of the Hobbs Act. Id. § 1951(b)(2). The plaintiffs characterize these crimes as the "pattern of racketeering activity" underlying their RICO claims. See id. § 1961(1).

In response to the complaint, the defendants moved to dismiss, arguing, inter alia, that the plaintiffs had failed to plead mail and wire fraud with the requisite particularity. See Fed. R. Civ. P. 9(b). The plaintiffs rejoined that, insofar as their claims relied on transmissions from the defendants to the plaintiffs, they had sufficiently pleaded them. In support of this point, the plaintiffs submitted an appendix explaining that "through their communications with the plaintiffs [*sic*] classes the defendants failed to disclose, misrepresented and covered up" the alleged overcharges and underpayments. The plaintiffs stated that the communications thus "misled them to believe that" they were paying the correct charge or receiving the correct payment.

The district court denied the motion to dismiss in part, ruling that the plaintiffs had adequately pleaded "communications that fraudulently induced Plaintiff subscribers and providers to accept lower reimbursements and higher charges."[2] Nevertheless, the district court ordered the plaintiffs to amend part of their complaint to identify certain of those communications in accordance with Rule 9(b). The plaintiffs then filed an amended complaint asserting only those four counts that had survived the motion to dismiss. Three of these counts alleged that the defendants made mailings and wire transmittals "[f]or the purpose of executing and concealing" various "artifices," consisting of claim practices that have resulted in the overpayment of deductibles by subscribers or the underpayment of providers for their services to the subscribers.[3] The fourth count alleged that the defendants violated the Hobbs Act by threatening the providers with economic injury in the form of exclusion from the network of insurance plans

---

[2]The district court granted the motion as to other counts of the complaint on a number of grounds, including failure to plead them with particularity. The plaintiffs have not appealed from any aspect of the district court's ruling on the motion to dismiss.

[3]The amended complaint also alleged, as additional predicate acts underlying one of these counts, violations of the anti-kickback provisions of the Medicare Act, 42 U.S.C. § 1320a-7b(b) (Supp. 2006). The plaintiffs, however, did not rely on this theory at summary judgment, and have not done so here. Accordingly, we do not consider it.

administered by the defendants, audits of the providers' accounts, withholding of payments, and denial of patient referrals.

Subsequent to the amended complaint, the district court approved the parties' joint proposed scheduling order. The order provided that fact discovery would consist of two phases of roughly four months each, with the first to conclude before the plaintiffs filed their motion for class certification, and the second to commence after briefing on that motion had been completed. The order noted, however, that

> class certification discovery will in part overlap with merits discovery in that plaintiffs may request general or 'template' documents in addition to documents referring to the named plaintiffs and take [Fed. R. Civ. P.] 30(b)(6) depositions of the [defendant] corporations to ascertain their claims procedures . . . and similar factual issues without discovery as to damages and similar merit-intensive discovery.

While the order provided a deadline for the filing of dispositive motions, it also noted that the "[p]arties may file dispositive motions earlier, if they understand that the issue(s) are ripe."

After several months of discovery, including the depositions of the named plaintiffs and Triple S (by way of several Rule 30(b)(6) designates) and the exchange of voluminous written discovery, the plaintiffs moved for class certification. The defendants opposed the motion on the grounds that, inter alia, the plaintiffs lacked standing to maintain the claims set forth in the amended complaint which, apart from being fatal to class certification in its own right, also meant that the plaintiffs

could not satisfy the "typicality" and "adequacy" requirements of Fed. R. Civ. P. 23. The defendants argued that, according to the plaintiffs' own deposition testimony, they had suffered no harm from the alleged racketeering activity, viz., the violations of the mail and wire fraud statutes and the Hobbs Act. In particular, the defendants noted that the plaintiffs could not say how the communications they received from the defendants concealed their alleged schemes.

In response, the district court issued an order directing the plaintiffs to show cause within ten working days why summary judgment should not enter against them based on the deficiencies in proof identified by the defendants. While the court acknowledged "that an objection to class certification is not the proper vehicle through which to attack standing," it reasoned that the "Defendants' arguments and the corresponding facts are so compelling that . . . it would be a poor use of judicial resources to proceed with class certification . . . without first establishing whether this case is even remotely viable."

Before reaching this conclusion, the court analyzed the plaintiffs' deposition testimony in detail, finding that it did not support their allegations of mail and wire fraud or extortion. The district court determined, for example, that none of the physicians serving as plaintiffs was "able to identify a single incident of fraudulent concealment" in the correspondence they received from

the defendants.  Yet the court recognized the possibility that the plaintiffs' "testimony as to whether or not their injuries were incurred through the transmission of 'fraudulent' communications or the infliction of 'extortion' relies on . . . incomplete understanding of various terms of art."  Accordingly, the show cause order would "give Plaintiffs a last opportunity to present a crystal clear picture of how their allegations are factually supported."  The court also preemptively rejected any argument that the incomplete state of discovery would prevent the plaintiffs from doing so, because their claims relied "on fraudulent communications that were delivered to [them] and on acts of extortion that were inflicted directly upon them."

Despite this admonishment, the plaintiffs rejoined that the district court would "create reversible error" by entering summary judgment before they had the opportunity to complete the discovery allowed by the scheduling order.  The plaintiffs did not, however, ask for an extension of time to respond to the order to show cause.  Instead, they submitted nearly three hundred pages of evidentiary materials, including the declarations of twelve plaintiffs and two expert witnesses and a number of exhibits.  Each of the plaintiffs attested to receiving documents from at least one of the defendants, but stated:

> It is impossible for a layman or a Plaintiff or class representative to articulate the specifics of the scheme/fraud solely from the documents received from the Defendants because of the concealed nature of their

-8-

fraud.  Therefore, I rely on the experts hired for this case to explain how the Defendant's [*sic*] practices form a RICO scheme.

Each of the plaintiffs claimed that, for the same reason, he or she could not "articulate the specifics [*sic*] damages suffered from the scheme/fraud" and relied on the experts to explain that as well.[4]

The plaintiffs' experts, for their part, verified that "[a] lay person to the insurance industry cannot understand the underlying . . . scheme/fraud because of its complexity, and the substantial time and resources which would have to be expended to understand the scheme."  While the experts provided some examples of each of the defendants' claim practices cited in the amended complaint, their explanations of how those "schemes" were fraudulent were decidedly less comprehensive.  The experts attested that each individual provider

has no way of knowing of the specifics of the scheme due to the overwhelming amount [*sic*] of documents the . . . provider receives from Triple-S on a monthly basis and because important information regarding the scheme is omitted from those documents.  The time and resources needed to go through the documents would be overwhelming and a substantial hardship.  Additionally, the documents received by the . . . provider, while not fraudulent on their face, are used in furtherance of the scheme for Triple-S to obtain an economic benefit that it does not rightfully deserve.

The experts gave a similar account of the alleged scheme to defraud the subscribers, explaining that they "would have no way of knowing

---

[4]The quoted language appears in identical form in each of the plaintiffs' declarations, including the typographical errors.

of [it] since part of this is reflected in the documents received by the [providers] of which the subscriber does not get copies."[5]

Based on these materials, the district court determined that the plaintiffs were advancing a new theory of mail and wire fraud: while they had asserted in response to the motion to dismiss that the transmissions from the defendants to the plaintiffs "misled them to believe that" they were paying the correct charge or receiving the correct payment, they were now arguing that those transmissions were "not fraudulent on their face."  But the district court  concluded that, under either theory, the plaintiffs could not survive summary judgment.

Treating the plaintiffs' new theory--that the defendants' transmissions violated the mail and wire fraud statutes because they failed to disclose the entirety of their schemes--as a proposed amendment to their complaint, the district court ruled that the plaintiffs had not alleged the underlying schemes with the particularity demanded by Fed. R. Civ. P. 9(b).  The court further ruled that the plaintiffs were not entitled to further discovery before satisfying this pleading requirement.  The district court also agreed with the defendants that the plaintiffs' original theory of mail and wire fraud and their claim of extortion had been

---

[5]The substantive portions of each expert's declaration were identical to those of the other's.

fatally undermined by their deposition testimony. Accordingly, the court entered summary judgment for the defendants.

## II.

The plaintiffs challenge the district court's decision on procedural and substantive grounds. First, they argue that the district court erred in entering summary judgment sua sponte before the plaintiffs had an opportunity to engage in discovery as to the merits of their claims. Second, the plaintiffs argue that even the limited evidence they were able to marshal at the time the court ordered summary judgment was sufficient to demonstrate genuine issues of material fact. We review these questions de novo. See, e.g., John G. Alden, Inc. of Mass. v. John G. Alden Ins. Agency of Fla., Inc., 389 F.3d 21, 24 (1st Cir. 2004).

## A.

A district court can enter summary judgment even though none of the parties asks for it. See Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Nevertheless, given the potential for unfairness lurking in this approach, we have ruled it out-of-bounds unless two separate conditions obtain. See Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29 (1st Cir. 1996). First, the discovery process "must be sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts." Id. Second, the district court must provide "the targeted party

appropriate notice and a chance to present its evidence on the essential elements of the claim or defense." Id.

The plaintiffs argue that the district court's course of action satisfied neither of these criteria, insisting that a district court cannot order summary judgment sua sponte unless and until discovery has been completed. But we have never adopted such a hard and fast rule. To the contrary, we have determined that a district court properly considered summary judgment on its own initiative once "discovery had proceeded to the point where the parties understood the material facts" at issue. Penobscot Indian Nation v. Key Bank of Me., 112 F.3d 538, 562 (1st Cir. 1997) (finding first condition satisfied where "parties had compiled a voluminous record that included depositions of all the parties involved" in event giving rise to claims); see also Frederique-Alexandre v. Dep't of Natural & Envtl. Res., 478 F.3d 433, 438-39 (1st Cir. 2007) (reaching same conclusion where "discovery had proceeded to the point where [non-targeted party] was able to move for summary judgment" on relevant issue). We have even affirmed summary judgment entered sua sponte before any discovery had taken place, where the decision was based on legal conclusions independent of any potentially available evidence. Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 431 (1st Cir. 1998) (upholding sua sponte summary judgment on contract claim unsupportable in light of unambiguous language of agreement).

These decisions comport with the rule that sua sponte summary judgment must wait until "the parties have enjoyed a reasonable opportunity"--not necessarily the full duration of the discovery period--"to glean the material facts."[6] Cf. Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1568 (1st Cir. 1994) (drawing distinction between discovery being "merely 'sufficiently advanced'" and "complete" for purposes of sua sponte summary judgment). Of course, what amounts to a "reasonable opportunity" largely depends on the state of the particular litigation and the nature of the issue decided by the sua sponte summary judgment procedure. Cf. Bank, 145 F.3d at 431 (observing that district court could not have properly relied on extrinsic evidence in entering sua sponte summary judgment on contract claim before discovery commenced). Here, given the circumstances at hand, we conclude that the plaintiffs did have "a reasonable opportunity to glean the material facts" before the district court ordered summary judgment on its own initiative.

Our conclusion follows largely from the fact that the district court decided to consider sua sponte summary judgment

_____

[6]Levya v. On The Beach, Inc., 171 F.3d 717 (1st Cir. 1999), on which the plaintiffs rely, is not to the contrary. There, we noted that because the parties "disagree[d] about the status of pretrial discovery . . . it [was] unclear whether the first condition precedent to a sua sponte summary judgment was met." Id. at 720. Accordingly, we did not decide that issue, but reversed the entry of sua sponte summary judgment based on the district court's failure to satisfy the second condition, i.e., adequate notice.

against the plaintiffs based on what they said at their own depositions. After reviewing that testimony in detail, the court made the preliminary determination that the defendants' interactions with the plaintiffs did not amount to violations of the mail or wire fraud statutes or the Hobbs Act. The court then stuck by that determination after reviewing the plaintiffs' testimony a second time during its evaluation of their response to the show cause order. In this context, discovery obtained from the defendants could not have altered the outcome which, in the district court's view, was ordained by the plaintiffs' own deposition testimony.[7] See Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33 (1st Cir. 2001) (noting propriety of summary judgment where plaintiff's deposition testimony "foreclosed any possibility of recovery from defendant").

Furthermore, by the time the plaintiffs were called upon to answer the show cause order, the discovery period had been running for nearly twelve months; during this time, the plaintiffs had taken the depositions of a number of Triple S employees pursuant to Rule 30(b)(6) and procured voluminous documents and other written discovery responses. This discovery enabled the parties to file comprehensive briefing, together with numerous evidentiary materials, on the plaintiffs' motion for class

---

[7]As we discuss in Part B, infra, the district court was correct that the plaintiffs' deposition testimony failed to support their claims.

certification. To support the motion, in fact, the plaintiffs asserted that the Rule 30(b)(6) "depositions established myriad examples of the uniformity and standardization of Defendants' practices that apply across the classes, namely in terms of pricing, standard communications, and automated systems that cover up the frauds the Plaintiffs allege or make them nearly impossible to detect." By even the plaintiffs' contemporaneous account, then, discovery was "sufficiently advanced that the parties ha[d] enjoyed a reasonable opportunity to glean the material facts" under consideration by the district court, Berkovitz, 89 F.3d at 29, namely, whether the "standard communications" supported the plaintiffs' claims.

The plaintiffs, however, maintain that they were not given the chance required by the first Berkovitz prong--nor, for that matter, the notice required by the second prong--because the district court entered summary judgment sua sponte before they could take the "merits discovery" permitted by the scheduling order. Seizing on our statement in Berkovitz that "[w]hen a court charts a procedural route, lawyers and litigants are entitled to rely on it," 89 F.3d at 30, the plaintiffs contend that the district court unfairly changed course by entertaining summary judgment in advance of the discovery cutoff. As just discussed, though, Berkovitz does not demand the completion of discovery before the entry of sua sponte summary judgment no matter what.

Moreover, the scheduling order specifically contemplated both that "class certification discovery [would] in part overlap with merits discovery" and that the parties could file dispositive motions prior to the deadline for doing so, "if they underst[ood] that the issue(s) [were] ripe." So the plaintiffs could not reasonably have believed, based on the order, that they would under no circumstances have to oppose summary judgment prior to the completion of merits discovery. And, when the district court gave them ten working days to do so by issuing the order to show cause, the plaintiffs did not seek an extension of time to respond. Under these circumstances, the plaintiffs had "appropriate notice and a chance to present [their] evidence on the essential elements of the claim[s]" that the district court found insufficient in entering summary judgment.[8] Berkovitz, 89 F.3d at 29. The sua sponte nature of the summary judgment order was not error.

**B.**

The plaintiffs also question the substance of the summary judgment order. Summary judgment can enter "against a party who fails to make a showing sufficient to establish the existence of an

---

[8]Again, Levya does not help the plaintiffs: there, we found the notice inadequate for sua sponte summary judgment in favor of individual defendants where the district court had previously announced that it would consider summary judgment against the corporate defendants only. 171 F.3d at 720. Here, in contrast, the district court specifically informed the plaintiffs that it was considering summary judgment against them, and the basis for its potential ruling, allowing them to address the issue.

element essential to that party's case, and on which that party will bear the ultimate burden of proof at trial." Celotex, 477 U.S. at 322. An essential element of the plaintiffs' case was mail and wire fraud, or extortion, which they characterized as the "pattern of racketeering activity" underlying their RICO claims. See 18 U.S.C. §§ 1961, 1962(a). The plaintiffs argue that their deposition testimony, together with their submissions in response to the show cause order, sufficed to create genuine issues of material fact as to whether the defendants had engaged in mail and wire fraud, as well as extortion. We consider the mail and wire fraud allegations first.

Mail or wire fraud requires proof of (1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of interstate mail or wire communications in furtherance of the scheme. See, e.g., United States v. Cheal, 389 F.3d 35, 41 (1st Cir. 2004); Perez v. Volvo Car Corp., 247 F.3d 303, 312-13 (1st Cir. 2001). As we have recounted, the district court entered summary judgment against the plaintiffs on their mail and wire fraud claims because (1) their deposition testimony did not support the allegations of mail and wire fraud set forth in the amended complaint and (2) the materials submitted in response to the show cause order advanced a new theory of mail and wire fraud which, even if treated as a second amendment to the complaint, was

-17-

not stated with the particularity required by Rule 9(b). The plaintiffs insist, however, that they "consistently alleged" the same theory of mail and wire fraud all along--that the defendants' transmissions "fail to disclose" or "conceal" how they process the plaintiffs' requests for payment--and that they had sufficient evidence to avoid summary judgment on that theory.

Taking the plaintiffs at their word that they did not shift theories in response to the show cause order,[9] we nevertheless believe that the district court properly entered summary judgment on the mail and wire fraud-based claims. A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes. See, e.g., Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1065, (11th Cir. 2007); United States v. Gray, 405 F.3d 227, 235-36 (4th Cir. 2005); United States v. Autuori, 212 F.3d 105, 118 (2d Cir. 2000); United States v. Cochran, 109 F.3d 660, 665 (10th Cir. 1997); Emery v. Am. Gen. Fin., Inc., 71 F.3d 1343, 1347 (7th Cir. 1995); United States v. Kamer, 781 F.2d 1380, 1386 (9th Cir. 1986). The authorities are less uniform on what "more" must be shown to transform a non-actionable nondisclosure into fraud in this context. Some courts have required a duty to disclose, triggered by an independent statutory scheme, the relationship between the

_____

[9]We therefore do not consider what the district court treated as the plaintiffs' "original" theory--that the communications from the defendants were facially "misleading."

parties, or the defendant's "partial or ambiguous statements that require further disclosure in order to avoid being misleading," Autuori, 212 F.3d at 119, while others have held that withholding information with the intent to deceive is enough, see, e.g., Grey, 405 F.3d at 235-36; Emery, 71 F.3d at 1348.

We considered the issue in Bonilla v. Volvo Car Corp., 150 F.3d 62 (1st Cir. 1998). There, we took the view that, without "a legal, professional or contractual duty" to disclose, the failure to do so generally cannot support a mail or wire fraud claim, though we acknowledged the existence of a "shadowy area" where nondisclosures in the absence of such a duty, if deliberate, could arguably "be treated as artifices to defraud under the federal statutes."[10]  Id. at 70.  We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who--a jury might find--secretly harbored in his heart the hope that the buyer would never ask."  Id.

For present purposes, however, we need not attempt to delineate the "shadowy area" where a failure to disclose,

---

[10]We expressed a similar view of the federal bank fraud statute, 18 U.S.C. § 1344 (2000), in United States v. Moran, 312 F.3d 480 (1st Cir. 2002).  There, we noted that "federal bank fraud, consistent with its statutory purpose, extends to active concealment even in the absence of a fiduciary, statutory, or other independent legal duty of disclosure where the defendant acts with the requisite intent to mislead or deceive."  Id. at 489 n.10.

accompanied by the necessary intent, might transmogrify into a "scheme to defraud" under the mail and wire fraud statutes. Though the district court rejected the plaintiffs' fraud-by-nondisclosure theory on the ground that they had not alleged it with particularity, the plaintiffs make no effort to explain how their theory even states a claim predicated on mail and wire fraud. They do not say whether the defendants have a duty to disclose "the actual manner in which the payment requests were processed" or, if so, what the source of that duty is; they do not say whether the defendants "fail[ed] to disclose" or "conceal[ed]" this information with the intent to deceive the plaintiffs. Instead, they proceed on the assumption that nondisclosure alone can support mail and wire fraud claims. As we have discussed, that is not the law, in this circuit or elsewhere.

To excuse this shortcoming, the plaintiffs argue that they cannot explain how the defendants' actions amount to a "scheme to defraud" without further discovery, because "[t]he schematics of the fraudulent conduct are, as in many RICO enterprises, within the control of the Defendants." We agree with the district court that this argument is "paradigmatically antithetical to Rule 9(b)'s requirement." As we have held, "the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action." Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985); see also Feinstein v. Resolution Trust Corp., 942 F.2d 34,

42 (1st Cir. 1991) ("It is not enough for a plaintiff to file a RICO claim, chant the statutory mantra, and leave the identification of predicate acts to the time of trial."). The plaintiffs have taken this proscribed approach here: they have charged the defendants with schemes to defraud in violation of the mail and wire fraud statutes, yet maintain that "[i]t is impossible for a layman or a Plaintiff or class representative to articulate the specifics of [each] scheme/fraud." By way of these statements, made in the declarations the plaintiffs submitted in response to the show cause order, they have essentially conceded what the district court suspected--that they cannot personally provide any information about the alleged fraud.

The plaintiffs did, as they emphasize, submit declarations from two expert witnesses "to explain how the Defendant's [*sic*] practices form a RICO scheme," but, as the district court concluded, those declarations fall short of that objective. Each declaration provides examples of the defendants' various claim practices challenged by the amended complaint, followed by the conclusion that the defendants send the plaintiffs documents "in furtherance of the scheme for Triple-S to obtain an economic benefit that it does not rightfully deserve."[11] The

---

[11]The plaintiffs argue that, if the district court had properly drawn all justifiable inferences from the evidence in their favor as required by the summary judgment standard, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986), these and like statements would have sufficed to demonstrate a genuine issue of

-21-

declarations do not explain, however, how any of these "schemes" equates with a "scheme to defraud" under the mail and wire fraud statutes--other than the statement that each individual plaintiff "would have no way of knowing of [the] scheme" and, again, simple nondisclosure does not mail or wire fraud make.

As the district court reasoned, the expert declarations (or even certain snippets of the plaintiffs' own deposition testimony) might have buttressed a theory that the defendants' claim practices violated the express or implied terms of their contracts with the plaintiffs, but "breach of contract itself [does not] constitute a scheme to defraud. Rather, the scheme must be intended to <u>deceive</u> another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." <u>McEvoy Travel Bureau, Inc.</u> v. <u>Heritage Travel, Inc.</u>, 904 F.2d 786, 791 (1st Cir. 1990) (citations omitted). Neither the experts' declarations--nor, by the plaintiffs' own admission, their own declarations or deposition testimony--so much as hint at such a scheme. Accordingly, "it is not simply details that [the plaintiffs] lack, but the substance of a RICO claim." <u>N. Bridge Assocs., Inc.</u> v. <u>Boldt</u>, 274 F.3d 38, 44 (1st Cir. 2001). The plaintiffs therefore had no right to further discovery to develop

---

material fact on their fraud-based claims. Given the statements' complete lack of specificity, we disagree. The purpose of summary judgment "is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit." <u>Lujan</u> v. <u>Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888-89 (1990).

their ill-defined theory of mail and wire fraud.  See id.; see also Ahmed v. Rosenblatt, 118 F.3d 886, 889 (1st Cir. 1997).  The district court correctly entered summary judgment for the defendants on the plaintiffs' fraud-based claims.  See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1070 (8th Cir. 1995) ("A district court may enter summary judgment dismissing a complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b).").[12]

The plaintiffs also challenge the district court's entry of summary judgment on their claim premised on extortion in violation of the Hobbs Act.  The Act outlaws extortion or attempted extortion affecting interstate commerce, see, e.g., United States v. Capozzi, 347 F.3d 327, 335 (1st Cir. 2003), defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).

---

[12]The plaintiffs question the district court's ruling that they had not pleaded fraud with particularity after it had ruled to the contrary in denying, in part, the defendants' motion to dismiss. But, absent "a particularly egregious abuse of discretion," district courts are free to reconsider their interlocutory orders. Harlow v. Children's Hosp., 432 F.3d 50, 55-56 (1st Cir. 2005). The plaintiffs make no effort to explain how the district court abused its discretion in deciding that the fraud-based claims in the amended complaint--once understood in light of the voluminous materials submitted on the motion for class certification and in response to the show cause order--were not pleaded with sufficient particularity.  See Murr Plumbing, 48 F.3d at 1070 (upholding district court's dismissal of claims at summary judgment as deficient under Rule 9(b) despite its prior denial of motions to dismiss on that basis).

-23-

In this context, "fear" includes "economic fear," but only if the fear is independently shown to be "wrongful," because "there is nothing inherently wrongful about the use of economic fear to obtain property," as opposed to the use of threatened force or violence to do so.  United States v. Sturm, 870 F.2d 769, 772-73 (1st Cir. 1989).  For this reason, "economic fear is wrongful under the Hobbs Act only if the plaintiff had a pre-existing statutory right to be free from the defendant's demand" for the property. George Lussier Enters., Inc. v. Subaru of New Eng., Inc., 393 F.3d 36, 40 (1st Cir. 2004).

By way of recapitulation, the plaintiffs complained of extortion in the form of threats of exclusion from the network of insurance plans administered by the defendants, audits of the providers' accounts with the defendants, withholding of payments, and denial of patient referrals.  But the district court, in deciding to issue the order to show cause, noted that most of the plaintiffs could not testify to receiving such threats and, even among those who could, none could claim that they rose to the level of "wrongful economic fear" prohibited by the Hobbs Act.  When the plaintiffs' response failed to convince the district court otherwise, it entered summary judgment against them on the extortion-based claim.

On appeal, the plaintiffs do not rely on the testimony of those among them who recounted having actually been threatened.[13] We need not consider, then, whether the district court was correct in classifying those threats as mere "lawful hard bargaining" rather than "wrongful economic fear" actionable as extortion. George Lussier Enters., 393 F.3d at 51. Instead, the plaintiffs argue that they did not have to receive the alleged threats directly to experience extortion, which can result from "implicit" threats as well as explicit ones. We agree that a threat need not be explicit to be extortionate: under the appropriate circumstances, a rock thrown through a window can be just as effective as a threatening letter in convincing the victim to relinquish his property. This is the lesson of the cases, on which the plaintiffs heavily rely, that upheld extortion convictions based on implied threats. See United States v. Lisinski, 728 F.2d 887, 889-92 (7th Cir. 1984) (affirming conviction of defendant who "preyed upon or exploited" restauranteur's fear that he would lose

---

[13]Nor do the plaintiffs make more than the most ephemeral reference to their claim that the defendants threatened economic harm through means besides audits, such as exclusion from the network or loss of patient referrals. Accordingly, while some of the plaintiffs stated in their declarations that they were forced to make unfavorable deals with the defendants to avoid these consequences, we do not consider any claim based on that aspect of the defendants' conduct. See, e.g., Casillas-Diaz v. Palau, 463 F.3d 77, 83 (1st Cir. 2006) ("'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived'" (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))).

liquor license, even though defendant never expressly threatened that result); United States v. Glasser, 443 F.2d 994, 1007 (2d Cir. 1971) (affirming conviction of unionized window installers for throwing acid on windows installed by nonunionized counterparts).

To succeed on their RICO claim based on the alleged Hobbs Act violations, however, the plaintiffs must show not only that extortion occurred, but that "they suffered a direct injury as a result of [it]." George Lussier Enters., 393 F.3d at 51. The plaintiffs do not point us to anything in their deposition testimony or declarations suggesting that they did.[14] Instead, they rely solely on their experts' declarations that "Defendants use their audit practices in an abusive manner as a means of forcing the providers to accept unilateral changes to the contract and inhibiting questions or complaints from those providers regarding their practices." But this statement, even taken at face value, does not suggest that any of the plaintiffs themselves ever acquiesced to these demands. The plaintiffs cannot press a RICO claim based on attempts at extortion that did not succeed in harming them. See Camelio v. Am. Fed'n, 137 F.3d 666, 670-71 (1st

---

[14]The plaintiffs do refer to the testimony of one of the physicians among them, arguing that the district court erroneously concluded that she was never threatened with an audit when she had stated in her deposition only that she had never been audited. In fact, the plaintiffs argue, this physician had been threatened with an audit, as she attested in her subsequent declaration. The declaration does not, however, state that the physician ever gave up any rights as a result of the claimed threat and therefore does not cure the deficiency in the plaintiffs' extortion-based claim.

Cir. 1998).  The plaintiffs have not shown that the district court erroneously entered summary judgment on their RICO claim predicated on the defendants' alleged violations of the Hobbs Act.

### III.

For the foregoing reasons, we **<u>affirm</u>** the district court's entry of summary judgment for the defendants.

**<u>So ordered.</u>**