SKYHOOK WIRELESS, INC.

v.

GOOGLE, INC.

CIVIL ACTION NO. 10–11571–RWZ

United States District Court, D. Massachusetts.

Signed February 18, 2015

Aaron M. Nathan, Annaka Nava, Azra M. Hadzimehmedovic, Matthew D. Powers, Paul T. Ehrlich, Samantha A. Jameson, Steven S. Cherensky, William P. Nelson, Tensegrity Law Group, LLP, Redwood Shores, CA, Scott McConchie, Thomas F. Maffei, Sherin and Lodgen LLP, Boston, MA, for Skyhook Wireless, Inc.

Ajay S. Krishnan, Alexander Dryer, Asim M. Bhansali, Matthias A. Kamber, Rachael E. Meny, Reese Nguyen, Reid P. Mullen, Robert A. Van Nest, Keker & Van Nest, LLP, San Francisco, CA, Amanda K. Streff, Steptoe & Johnson, LLP, Chicago, IL, Boyd Cloern, Kfir B. Levy, Paul D. Lall, Tremayne Norris, Trevor Hill, Steptoe & Johnson LLP, Washington, DC, Michael E. Flynn-O'Brien, Sanjeet K. Dutta, William F. Abrams, Steptoe & Johnson LLP, Palo Alto, CA, Benjamin M. Stern, James D. Smeallie, Holland & Knight (B), Boston, MA, for Google, Inc.

## MEMORANDUM OF DECISION

ZOBEL, DISTRICT JUDGE.

Plaintiff Skyhook Wireless, Inc., alleges that defendant Google, Inc., has infringed several of its patents. Defendant has moved for summary judgment of invalidity for indefiniteness and non-infringement on the asserted claims of U.S. Patent Nos. 8,154,454, 8,223,074, and 8,242,960 (Docket ## 464, 466); summary judgment of non-infringement on the asserted claims of U.S. Patent No. 8,054,219 (Docket # 462); summary judgment of non-infringement on the asserted claims of U.S. Patent Nos. 7,433,694, 8,031,657, and 7,474,897 (Docket # 465); and summary judgment of non-infringement on the asserted claims of U.S. Patent No. 7,856,234 (Docket # 463).

## I. Background

Plaintiff filed its first suit against defendant on September 15, 2010 (Docket # 1), alleging infringement of four patents.[1] I construed the disputed terms of these patents and held two of them invalid for indefiniteness (Docket # 96). Plaintiff filed a new action on September 20, 2012, in the United States District Court for the District of Delaware, alleging infringement of nine additional patents.[2] That action was transferred to this court, and I allowed the parties' joint motion to consolidate the cases (Docket # 157). I again construed the disputed terms and held two more patents invalid for indefiniteness (Docket # 339). In considering the present motions, I also recently revised two of my earlier claim constructions (Docket # 526).

## II. Legal Standards

Summary judgment will be granted if there is no genuine dispute as to any ma-

---

1. They were U.S. Patent Nos. 7,414,988 (the "'988 patent"); 7,433,694 (the "'694 patent"); 7,474,897 (the "'897 patent"); and 7,305,245 (the "'245 patent").

2. They were U.S. Patent Nos. 7,856,234 (the "'234 patent"); 8,019,357 (the "'357 patent"); 8,022,877 (the "'877 patent"); 8,154,454 (the "'454 patent"); 8,223,074 (the "'074 patent"); 8,242,960 (the "'960 patent"); 8,229,455 (the "'455 patent"); 8,054,219 (the "'219 patent"); and 8,031,657 (the "'657 patent").

terial fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(a).[3] The court must view the record in the light most favorable to the nonmovant and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party initially bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party has carried its burden, to defeat the motion, the nonmovant must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed. R.Civ.P. 56(e) (emphasis omitted)). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

■ Because patents are presumed to be valid, *see* 35 U.S.C. § 282, a finding of invalidity must be supported by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S.Ct. 2238, 2239, 180 L.Ed.2d 131 (2011). Indefiniteness for failure to comply with 35 U.S.C. § 112, ¶ 2, however, "is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed.Cir.1998). "[A]s a question of law for the Court, the definiteness determination is well suited for disposition at summary judgment." *VLT Corp. v. Unitrode Corp.*, 130 F.Supp.2d 178, 196 n. 14 (D.Mass.2001); *cf. Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed.Cir.2001).

■ Summary judgment of non-infringement may be granted only if one or more limitations of the claim in question do not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed.Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed.Cir.2002) ("Summary judgment of noninfringement is … appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Summary judgment of non-infringement can therefore be granted only if, viewing the facts in the light most favorable to the patentee, there is no genuine issue as to whether the accused product is covered by the claims as I have construed them. *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed.Cir.1999).

### III. Google's Motion for Summary Judgment of Invalidity for Indefiniteness of the '454, '074, and '960 Patents (Docket # 466)

■ Google moves for summary judgment of invalidity of the '454, '074, and '960 patents, contending that the claim term

---

**3.** Although this is a patent case, the Federal Circuit will apply the law of the First Circuit to procedural matters like summary judgment. *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1572 (Fed.Cir.1997).

"inferring," which is a part of each asserted claim, is indefinite because it does not identify any function or structure that would inform a person of ordinary skill in the art of what steps or apparatus fall within its scope. To satisfy the definiteness requirement, a patent's specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention." 35 U.S.C. § 112, ¶ 2 (2006). "[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, L.L.C. v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed.Cir.2005). In last year's *Nautilus, Inc. v. Biosig Instruments, Inc.* opinion—on which Google heavily relies—the Supreme Court held that § 112, ¶ 2 "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." —— U.S. ——, 134 S.Ct. 2120, 2129, 189 L.Ed.2d 37 (2014); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, —— U.S. ——, 135 S.Ct. 831, 835–36, —— L.Ed.2d —— (2015). The definiteness requirement therefore "mandates clarity [in patent claims], while recognizing that absolute precision is unattainable." *Nautilus*, 134 S.Ct. at 2124.

The '454, '074, and '960 patents are all titled "Systems and Methods for Using a Satellite Positioning System to Detect Moved WLAN Access Points." They are all in the same family, each being a continuation of the patent application that issued as U.S. Patent No. 8,022,877. Their speci-

fications are virtually identical, and they are all largely directed to detecting that a wireless local area network ("WLAN") access point ("AP"), like a WiFi access point, is no longer at its previously known or calculated location. Claim 1 of the '074 patent is illustrative:

A method of using a Wireless Local Area Network (WLAN) and satellite enabled device to infer that a reference location associated with a detected WLAN access point (AP) is not the present location of the AP, the method comprising:

identifying WLAN APs detected by the WLAN and satellite enabled device;

accessing a reference database to obtain a reference location associated with at least one of the WLAN APs;

receiving at least one possible Satellite Positioning System (SPS) location solution of the device based on satellite measurements from at least two satellites;

estimating a distance between the reference location associated with the WLAN AP and the at least one possible SPS location solution; and

*inferring* that the reference location associated with the WLAN AP is not the present location of the WLAN AP if the distance between the reference location associated with the WLAN AP and the at least one SPS location solution is above a predetermined threshold.

Each of the asserted claims includes an "inferring" step, like the one emphasized above.[4]

### A. Indefiniteness

■ I begin by attempting to construe the disputed claim term, "inferring," ac-

---

4. Some of the claims, like claim 13 of the '074 patent, are system claims rather than method claims. The system claims have roughly the same structure as the method claims, with the

last step in each being directed toward a "logic for inferring" rather than an "inferring" operation.

cording to the principles of claim construction explained in my previous order. *See* Docket # 339 at 3. As Google correctly notes, the only occurrence of "infer" or "inferring" in the '454, '074, and '960 patents is in the claims. The term is not defined in the specification. "Infer," however, is a common term in general discourse. It is defined as "to derive as a conclusion from facts or premises." Merriam–Webster's Collegiate Dictionary 639 (11th ed. 2003) (Docket # 468–5); *see also* American Heritage Dictionary of the English Language (5th ed.2014) (defining "infer" as "[t]o conclude from evidence or by reasoning" or "[t]o involve by logical necessity; entail").[5] There is no reason to conclude that a person of ordinary skill would not understand "infer" to have its ordinary meaning in the context of the asserted claims.

Google advances two arguments in support of its position that "inferring" has no meaning in the context of the claims. First, it contends that a person of skill in the art would not understand what it means to "infer" because the term "provides no bounds such as requiring that the APs be 'declared as moved,' 'removed from the list of APs,' 'flagged,' or 'logged.'" Docket # 469 at 7 (quoting examples from the '074 patent specification at 9:30–35). But that is because the term includes all of those situations, many of which are separately covered by the dependent claims. To read a "flagging" or "declaring" limitation into the independent claims would improperly render the dependent claims superfluous. *Cf. AllVoice Computing PLC v.*

*Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1248 (Fed.Cir.2007) ("[T]his court enforces a presumption that each claim in a patent has a different scope.") (internal quotation marks omitted). Second, Google contends that the claims are indefinite because the patent provides no clues as to what the "predetermined threshold" might be. This overlooks the same issue. In the independent claims, a person of ordinary skill would understand "predetermined threshold" to mean *any* numerical cutoff. This is because the dependent claims, like claim 7 of the '074 patent, further refine the range in which the cutoff may fall. *See, e.g.,* '074 patent, claim 7 ("The method of claim 1, wherein the predetermined threshold is based on an estimated coverage area of the WLAN AP.").

Because I have been able to construe "inferring," I cannot conclude that the asserted claims are indefinite. As drafted, the patents' claims would "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S.Ct. at 2129.

## B. Summary Judgment of Definiteness

■ Denial of summary judgment typically turns on a dispute of material fact, but that is not the case here. At the hearing on its motion, Google's counsel conceded that its indefiniteness argument is essentially a matter of claim construction and does not present any disputes of material fact. A district court may grant summary judgment in favor of a nonmovant where it believes that the movant has

---

5. As Google correctly notes, many dictionaries give multiple definitions for "inferring," which could conceivably give rise to ambiguity. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1321–22 (Fed.Cir.2005). The exhibit submitted by Google includes three additional definitions: "guess, surmise," "to involve as a normal outcome of thought [or] to point out," and "suggest, hint." Docket # 468–5. These definitions are not in conflict. In the context of the patents, in which "inferring" appears as a step in a method (or a method step performed by a system), there is no difference in scope among these definitions. The ordinary meaning of "inferring" here is clear.

had adequate notice of the grounds for that judgment, and where there is clear support for such judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Berkovitz et al. v. Home Box Office, Inc.*, 89 F.3d 24, 29–30 (1st Cir.1996).[6] That describes the situation here. Therefore, summary judgment in favor of Skyhook that the asserted claims of the '454, '074, and '960 patents are definite is appropriate. There is no factual issue for the jury to decide that would warrant a trial on the issue of these claims' definiteness. The undisputed facts, viewed as Google urges, show that the asserted patent claims are definite as a matter of law.

## IV. Google's Motion for Summary Judgment of Non–Infringement of the '454 and '960 Patents and Partial Non–Infringement of the '074 Patent (Docket # 464)

As an alternative to its invalidity arguments, Google also moves for summary judgment of non-infringement on the asserted claims of the '454, '074, and '960 patents. Skyhook accuses Google's WiFi Pipeline and AP Observation Table of infringing these claims.[7] According the Skyhook, the operations performed by these components infringe all asserted claims of all three patents. Google disagrees, primarily because it contends that the AP Observation Table is not a "reference database" as I have construed that claim term.

Skyhook specifically accuses Google Location Services of infringing the patents through its WiFi Pipeline component, which runs on Google servers. The high-level facts of how this system operates are not disputed. Once users opt into Google's location services program, their devices (e.g., smartphones) periodically scan for WiFi APs within range of the device. The devices gather information about those APs and submit that information to Google. Each submission includes: (i) the time and date; (ii) the scanning device's own location as determined by its GPS sensor; (iii) the unique media access control ("MAC") address of each detected AP; and (iv) the signal strength of each detected AP. This information is saved in the AP Observation Table. Each AP in the AP Observation Table may therefore have multiple observation locations associated with it. The AP Observation Table does not store any calculations based on these observation locations, like a calculated estimate of where the AP itself is located. A different Google database, the WiFi AP Table, stores that kind of information.

Skyhook alleges that the AP Observation Table meets the claims' "reference database" limitation. I construed this term to mean a "collection of data that contains reference locations of a plurality of APs." Docket # 339 at 15. I also construed "reference location," which is used in my construction of "reference database," to mean a "known or calculated

---

6. According to the First Circuit, a court may only enter summary judgment sua sponte if: (1) fact discovery is sufficiently advanced that the parties enjoyed a reasonable opportunity to glean the material facts; and (2) the targeted party has appropriate notice and a chance to present its evidence on the essential elements of the claim. *Berkovitz*, 89 F.3d at 29. Both conditions are met here. Discovery is complete in this four-year-old case, and it is set for trial in less than a month. Skyhook expressly requested that the court sua sponte

grant summary judgment of definiteness in its opposition to Google's motion, Skyhook Opp. (Docket # 481) at 11, and Google responded to Skyhook's request in its reply. *See* Google Reply (Docket # 498) at 5.

7. Skyhook also accuses a Google device-based system of infringing the '074 patent. Google does not seek summary judgment on those issues. *See* Mem. in Support of Mot. at 1 n.1.

location." Docket # 526 at 2. The question that I must now resolve is whether a reasonable juror, taking the facts in the light most favorable to Skyhook, could conclude that the Google AP Observation Table is a "collection of data that contains known or calculated locations of a plurality of APs." Google contends that the answer is no, because the AP Observation Table includes coordinates where an AP was observed, rather than the coordinates where the AP actually is. Skyhook disagrees, contending that a reasonable juror could find that the coordinates in the AP Observation Table are accurate enough to be deemed a "known . . . location" of each AP.

The parties do not dispute that "location," the term central to this dispute, has its plain and ordinary meaning. As Google informs me, the Federal Circuit has explained that when "location" is used in its "ordinary sense . . . the common, broad understanding" of the word is "where a thing is." *Optimal Recreation Solutions LLP v. Leading Edge Techs., Inc.*, 6 Fed. Appx. 873, 876 (Fed.Cir.2001). But "location," despite its "clarity," id. has some inherent subjectivity. For example, when I held the hearing on Google's motion, the location of the hearing was Boston, Massachusetts. More specifically, it was the John Joseph Moakley United States Courthouse at 1 Courthouse Way. Even more specifically, it was the fifth floor of that courthouse. And even more specifically, it was courtroom 12 of that courthouse. All of these are "locations" of the hearing, but which "location" has the requisite specificity for a particular situation depends on context. Although it might have sufficed for the parties' California-based lawyers to tell their next-door colleagues that they were going to a hearing in "Boston," one expects that their taxi drivers at Logan Airport demanded more detail.

The patents' specifications provide little help in narrowing the scope of the term. In discussing prior art systems, the specifications mention PlaceLab as a prior art example of a WLAN-based positioning system. '074 patent at 2:55–63; '454 patent at 2:59–67; '960 patent at 2:60–3:1. PlaceLab "us[ed] access point locations acquired from amateur scanners . . . as reference locations." '694 patent at 2:30–40. Skyhook contends, with testimony from a PlaceLab founder, that "Place Lab's database stored the raw scanning locations of devices as the locations of access points, using that scanning data as reference points to position users." Docket # 488 at 12. This citation in the patents' specifications to a system that used observation coordinates as AP locations would make it improper for me, as a matter of claim construction, to read "location" more narrowly and construe the claims to exclude such a system.

Other parts of the claims are similarly unhelpful for narrowing the scope of "location." Google contends that because all of the asserted independent claims require "estimating a distance between *the* reference location associated with the WLAN AP" and "at least one possible Satellite Positioning System (SPS) location solution," '074 Patent at 14:22–23, 25–26, "reference location" must be read such that there can only be one per AP. Google's analysis misunderstands what the claims mean. Claim 1 of the '074 patent, for example, is directed to a method where the first step involves "identifying WLAN APs," the second involves "accessing a reference database to obtain a reference location associated with at least one of the WLAN APs," the third involves "receiving at least one possible [SPS] location solution," and the fourth involves "estimating a distance between *the* reference location associated with the WLAN AP and the . . .

SPS location solution."[8] "The" in the fourth step does not mean that there is only one reference location per AP—it means that the fourth step uses the reference location obtained in the second step. *Cf. Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C.Cir.2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'"). The use of "a" before "reference location" in the second step provides no guidance on whether more than one reference location may be associated with an AP.

■ "Claims are often drafted using terminology that is not as precise or specific as it might be." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed.Cir.1998). Although I have "defined ['reference database'] with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction," it still has some subjective elements. *Id.* Now, "the task of determining whether the construed claim reads on the accused product is for the finder of fact." *Id.* The jury must decide, in light of the evidence, whether the coordinates stored in Google's AP Observation Table are in fact close enough to the actual coordinates of the APs to be deemed the APs' "locations." Viewing the facts in the light most favorable to Skyhook, a reasonable juror could conclude that the entries in Google's AP Observation are "reference locations" of the observed APs. Google's motion is therefore denied.[9]

## V. Google's Motion for Summary Judgment of Non–Infringement of the '219 Patent (Docket # 462)

### A. The '219 Patent

Google next moves for summary judgment of non-infringement of the '219 patent. The '219 patent is directed to the use of WiFi-derived position information as an input, or starting point, for a GPS-based position estimate.[10] According to the patent, the invention may "improve accuracy of location estimates, increase availability of the positioning service to more users, reduce power consumption, and also ... improve estimation of the expected error in a user's position estimate." '219 patent at 1:50–53. Asserted claims 4–6 generally relate to a system that has a position module comprising (1) a WLAN module and (2) a satellite positioning module capable of performing certain functions. For

---

8. I have omitted limitations from claim 1 of the '074 patent for clarity in responding to Google's argument here. The limitations, of course, remain.

9. Google ends its brief with a six-line section seeking summary judgment of non-infringement under the doctrine of equivalents because, according to Google, Skyhook's expert did not offer sufficient opinions on this theory to speak to it at trial. But Mr. Geier, Skyhook's expert, explains his doctrine of equivalents infringement opinion in appendix D, paragraph 50 of his report. He also explains the understanding of the law that led him to form this opinion in paragraphs 26 and 27 of his main report. Google has therefore failed to show that it is entitled to summary judgment on this point.

10. The patent is generally written in terms of "satellite positioning systems," or "SPS," but it says that GPS, or the Global Positioning System, is a type of SPS. *See, e.g.*, '219 patent at 2:38–41 ("All positioning systems using satellites as reference points are referred to herein as Satellite-based Positioning System (SPS). While GPS is the only operational SPS at this writing, other systems are under development or in planning."). Google contends that this is an undisputed fact, which Skyhook appears not to contest. *See, e.g.*, Skyhook's Opp. to Google's Statement of Undisputed Material Facts at 1.

example, independent claim 4 is directed to:

> A system for reducing the time-to-fix of a satellite based position estimate using an initial position provided by a WLAN positioning system, the system comprising:
>
> a positioning module comprising:
>
> a WLAN module for receiving signals from one or more WLAN access points within range of the WLAN and satellite enabled device and for determining at least one position estimate of the WLAN and satellite enabled device and at least one corresponding uncertainty estimate based on the signals received from the one or more WLAN access points; and
>
> a satellite positioning module for obtaining satellite information from at least four different satellites, wherein the satellite positioning module uses the at least one WLAN position estimate of the WLAN and satellite enabled device as an initial position and the at least one corresponding uncertainty estimate to determine a final position estimate of the WLAN and satellite enabled device.

Claims 5 and 6 depend from claim 4 and refine it to claim certain types of "WLAN position estimate systems."

Two claim terms relevant to Google's motion have already been construed. I construed "an initial position" to mean "a position estimate made before the satellite positioning system calculates a position estimate." Docket # 339 at 18. The parties also agreed that "using/uses the at least one WLAN position estimate [of] the WLAN and satellite enabled device as an initial position" means "using the estimate of the present location of the device calculated by the WLAN positioning system as an initial position for the SPS before calculating a final position estimate." Docket # 249–2 at 2.

## B. The Accused Products

Skyhook accuses Android devices with WiFi, Network Location Provider (NLP), and Qualcomm chips running certain Qualcomm firmware of infringing the '219 Patent.[11] According to Skyhook, the combination of the Android device's WiFi capability and NLP is the infringing WLAN module, and the GPS functionality in the Qualcomm is the infringing satellite positioning module. Google does not manufacture any of these devices, and, with the exception of a few devices sold on the Google Play Store (called the Nexus or Google Play devices), Google also does not sell them.

The general operation of the accused system is undisputed. NLP is a feature of the Android mobile platform[12] that allows a device to estimate its geographical position. NLP obtains cell-ID information from cellular towers, queries the Google Location Server for cellular tower locations, and calculates the device position based on that data.[13] It also obtains WiFi

---

11. Specifically, Qualcomm firmware compatible with QMI_LOC API version 2.0 or later and after the implementation of the MSM GPS HAL. Skyhook specifically accuses the 23 devices listed in Attachment A to Appendix E of the Report of Mr. James Geier, Skyhook's infringement expert, but also accuses any other devices with the same identified functionality.

12. Generally speaking, Android is a mobile operating system that is designed primarily for touchscreen devices, like smartphones and tablet computers. Google developed Android, which it has released under open source licenses. Android is one of the most used operating systems in the world.

13. The parties dispute whether NLP allows a device to determine its geographic location by using cell-ID information without also determining its geographic position using Wi–Fi AP information. For the purposes of this summary judgment motion, where I must

156

identification information from the WiFi APs detected by the device during a WiFi scan, queries the Google Location Server for AP locations (or accesses a local cache of AP locations on the device), and uses that data to calculate device position. Once the device position has been calculated, NLP passes it to the Qualcomm GPS receiver. The position is saved in the memory of the Qualcomm GPS receiver and may be used by the GPS receiver to help it prioritize satellites to be used in a GPS position fix.

The parties agree that the next steps depend on whether the device contains saved location information. When a device is turned off, its saved location information, including any prior GPS fixes, is deleted. When the device is turned back on (called a "cold start"), there is no location information in the GPS receiver. To determine its position, the device conducts a scan of the cellular towers and Wi–Fi APs that it detects, collects new location data from the Google Server (or accesses its local cache of WiFi AP location information), and computes the device position estimate and an uncertainty estimate. Skyhook contends that the accused Android code [14] passes this result (i.e., the device position and uncertainty estimates) to the Qualcomm GPS receiver. The position information is further processed in the Qualcomm GPS receiver by the Qualcomm firmware, which is the software that issues instructions to the hardware. The Qualcomm GPS receiver then uses the passed device position as a position estimate to reduce the range of satellites that the GPS will search for to determine the device position.

After the first GPS fix, the NLP provides additional position and uncertainty estimates to the Qualcomm GPS receiver. The Qualcomm GPS receiver compares the uncertainty estimate of the previous, saved position data, whether from NLP or from a previous GPS fix, against that of the new NLP position data and selects the position with the lowest uncertainty to use to obtain the next GPS fix. The GPS then uses that position data (either old or new) to determine the device position.

## C. Direct Infringement by the Accused Devices

Google's primary argument is that the accused Qualcomm GPS does not use the uncertainty estimate to calculate a final position, which it contends is required by the asserted claims. According to Google, Skyhook's experts never opine that the SPS uses an uncertainty estimate as an input in satellite positioning, but rather opine only that the SPS considers an uncertainty estimate in deciding which WiFi-based position estimate to use as an initial position. Put simply, Google contends that the SPS must use the uncertainty estimate in its final position calculation; Skyhook, according to Google, cannot show infringement merely by showing that the SPS uses the uncertainty estimate to determine which position estimate goes into the final position calculation. Skyhook counters that Google is attempting to reopen claim construction because, despite not asking me to construe "use ... to determine," Google is now trying to argue that this term means "calculate." This, according to Skyhook, is an improper attempt to narrow the claims. And, regardless, Skyhook argues that the question of whether the accused products "use" an uncertainty estimate to determine a final position estimate presents a genuine dispute of fact for the jury to determine.

view the disputed facts in the light most favorable to Skyhook, I assume that it does not.

**14.** Skyhook contends that all of Google's Android releases beginning with 4.2 infringe.

Google apparently agrees with Skyhook that its argument "is an issue of claim interpretation." Google Reply Br. at 1. Google admits that it is now asking me, well over a year after the claim construction hearing, to construe a disputed term (i.e., "uses ... to determine") and give it a specialized, out-of-the-ordinary meaning.[15] As an initial matter, this argument is untimely. If Google wanted to tee up a summary judgment position based on a particular construction, "it could (and should) have sought a construction to that effect." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed.Cir.2012) (concluding that a post-trial challenge to the sufficiency of the evidence of infringement was an inappropriate and untimely attempt to give a narrow definition to "determining"); *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1325 (Fed.Cir.2013) (concluding that district courts are not obligated to rule on claim construction arguments presented for the first time in summary judgment briefs). Although the court has a duty to resolve fundamental disputes about claim scope, *O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed.Cir.2008), it is "not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *Id.* at 1362 (emphasis in original). Google had ample opportunity to argue for a narrower definition of the disputed term at the claim construction phase of this case, but it failed to do so. Google even agreed with Skyhook on a construction of a related phrase in the same claim that repeats the word that it now argues requires interpretation. *See* Docket # 249-2 at 2 (agreeing that *"using/uses* the at least one WLAN position estimate [of] the WLAN and satellite enabled device as an initial position" should be construed as

*"using* the estimate of the present location of the device calculated by the WLAN positioning system as an initial position for the SPS before calculating a final position estimate" (emphasis added)). There is no need to construe now a readily understandable term that Google itself thought clear when offering proposed constructions of related terms.

■ I will therefore consider the parties' summary judgment arguments as "part of the infringement analysis, not part of the claim construction." *Thorner v. Sony Computer Entertainment Am., LLC*, 669 F.3d 1362, 1369 (Fed.Cir.2012). I "will view the parties' disputes through the lens of whether a reasonable jury, armed with the Court's claim construction as to certain terms and an instruction that the plain and ordinary meaning controls as to others, could or would necessarily conclude that the asserted claim reads on an accused device." *Apple, Inc. v. Samsung Elecs. Co.*, No. 12–CV–00630–LHK, 2014 WL 252045, at *5 (N.D.Cal. Jan. 21, 2014); *see also ePlus, Inc.*, 700 F.3d at 520 (concluding that, "[i]n the absence of [a narrower] definition," the infringement question should be resolved from the perspective of a "jury ... free to rely on the plain and ordinary meaning of the term").

Neither party disputes that, for each GPS position determination in the accused devices, the NLP injects at least one position estimate and its associated uncertainty estimate into the GPS receiver. Similarly, neither party disputes that the GPS receiver does something with both of these quantities. For the position estimate, the GPS receiver, at a minimum, (1) saves the position estimate in its memory; and (2) may use the position estimate to help it prioritize satellites to be used in a GPS position fix. Resp. to Statement of Undis-

---

**15.** Although not clear from Google's submissions, Google appears to seek a construction

like "rely on ... as part of a calculation that returns."

puted Facts at 6. For the uncertainty estimate, at a minimum, the GPS receiver (1) checks whether the uncertainty estimate is valid; and (2) "compar[es] the uncertainty associated with the NLP position estimate to that associated with position estimates from other sources ... as options to use as" starting points for the next SPS position estimate. Opp. at 2; Reply at 1. Finally, the parties do not dispute that, after receiving these quantities, the GPS receiver determines the device position. Resp. to Statement of Undisputed Facts at 10.

 The question is whether, on these facts, a reasonable juror could conclude that the GPS receiver in the accused devices "uses [these two quantities] to determine a final position estimate of the WLAN and satellite enabled device." '219 patent, claim 4. I conclude that it may. Applying the ordinary meaning of "uses," a reasonable juror may find that the GPS receiver in the accused devices "uses" the position estimate when it saves the estimate in its memory or when it relies on the position estimate to narrow down the list of satellites that it will use to determine the device's position. Both of these operations necessarily involve the GPS receiver putting the position estimate into service in some way. Similarly, a reasonable juror may find that the GPS receiver in the accused devices "uses" the uncertainty estimate when it checks the uncertainty estimate's validity or when it compares multiple uncertainty estimates to determine which of multiple position estimates to use as the starting point for the GPS position estimate. Both of these operations also involve the GPS receiver putting the uncertainty estimate into service in some way. Finally, a reasonable juror may find that the GPS receiver of the accused devices "uses" some combination of these operations "to determine a final position estimate." Indeed, it is reasonable to find that the only purpose of the GPS receiver as a whole is to "determine a final position estimate" of the device, such that any operations performed by the GPS receiver are for that goal. Of course, a reasonable jury need not reach such a conclusion, but it is for the jury to decide whether to do so.

Google next contends that neither its "cold start" procedure nor its subsequent operation procedure practice all of the steps of the asserted claims, such that it cannot, under any circumstances, infringe. Google argues that the "cold start" procedure does not infringe because the GPS does not use the uncertainty estimate that accompanies the initial position data for any purpose. That is, even though the NLP passes both the initial position data and uncertainty estimate to the GPS in the cold start procedure, the GPS does not use the uncertainty estimate to select an input for the GPS calculation because there is nothing in the system for it to be compared to. Likewise, Google argues that the "subsequent operation" procedure does not infringe because, in this step, the GPS does not use an "initial position" at all. This argument rests on my construction of "initial position"—i.e., "a position estimate made before the satellite positioning system calculates a position estimate"—because Google contends that only position estimates made before the cold start process is complete can be "initial positions."

Whether the "cold start" process infringes ultimately turns on whether the GPS receiver of the accused devices "uses" the uncertainty estimate of the initial position estimate "to determine a final position estimate." As I explained in rejecting Google's first, broader non-infringement argument, a reasonable juror could find this to be so. A genuine issue of material fact therefore remains with respect to the

"cold start" process (i.e., whether the validity checks of the uncertainty estimates are a "use"), so summary judgment of non-infringement is inappropriate.

Google's reading of my "initial position" construction is similarly flawed. Under its reading of the term, a GPS receiver cannot infringe the asserted claims if it performs the claimed steps after determining a final position estimate a single time. The "initial position" must merely precede a position estimate calculated by the satellite positioning system; it need not precede *all* position estimates calculated by the satellite positioning system.

Google provides no persuasive support for its reading of "initial position" in the claims, the specification, or the file history. For example, Google points to column 6, lines 59–61 of the '219 patent, which says that "WLAN–PS initial position estimate and other estimations can help SPS reduce time to first fix (TIFF) and power consumption." Google contends that this statement supports its reading of "initial position" because it refers to "first fix," i.e., the first time the GPS receiver calculated a final position. But, despite quoting it, Google ignores the rest of the sentence—"and power consumption." Both an initial fix and subsequent fixes consume power, and having an "initial position" estimate would reduce power consumption for both the first and subsequent fixes. The section of the specification on which Google relies, which merely says that an "initial position" may reduce the time to first fix among other things, does nothing to limit the term only to position estimates calculated before first fix. *Cf.* Docket # 339 at 19 ("The use of an 'initial position' has several benefits, and a reduced time to 'first fix' of the SPS is just one of

them. . . . The specification teaches that reduced power consumption from the WLAN and satellite-enabled device and improved accuracy of positioning are two others.").

### D. Indirect Infringement

Google finally argues that Skyhook cannot establish that Google directly or indirectly infringes for devices that it does not sell (i.e., non-Nexus and non-Google Play devices).[16] Skyhook concedes that Google does not directly infringe the '219 patent for such devices, but asserts indirect infringement.

#### 1. Direct Infringement by Third Parties

 Liability for indirect infringement may arise if, but only if, there is direct infringement. *See, e.g., Limelight Networks, Inc. v. Akamai Techs., Inc.,* ─── U.S. ───, 134 S.Ct. 2111, 2117 & n. 3, 189 L.Ed.2d 52 (2014). Google, seizing on this truism, contends that it should receive summary judgment of non-infringement on all of Skyhook's indirect infringement claims because Skyhook's expert "has provided no opinion as to what single third-party entity directly infringes, or how that single entity puts the alleged invention of the '219 Patent into service or controls the system as a whole and obtains benefit from it." Mem. in Support of Mot. at 13. Skyhook responds by pointing to extensive testimony on this topic in that same expert's report, including (1) a detailed list of Android devices based on Qualcomm chips whose manufacture and sale with the Android operating system, NLP, and a Qualcomm chip, constitutes an act of direct infringement, see Docket # 493, Geier Decl., Exh. A, App. E, Attachment A; (2)

---

**16.** Google does not move for summary judgment on any indirect infringement claims relating to the Nexus and Google Play devices.

narrative sections of the report stating that each time an equipment manufacturer (such as Motorola or Samsung) builds and sells an Android phone that includes Google's NLP code, a version of Android since October 29, 2012, and one of the enumerated Qualcomm chips, Skyhook's system claims are directly infringed, *see id.* ¶ 44; and (3) narrative sections of the report discussing Wi–Fi location requests sent to Google from devices allegedly being used by end users to infringe the asserted claims, *see id.* ¶ 107. Skyhook also points to factual evidence and discovery responses that it may use at trial to support its direct infringement positions. Cherensky Decl., Exh. 14 at 85–90. Based on this record, a reasonable juror, taking all the evidence in the light most favorable to Skyhook, could find that the identified manufacturers or end users directly infringe the '219 patent.

## 2. Inducement Under 35 U.S.C. § 271(b)

■■■■ Induced infringement requires that (1) the accused inducer knew of the patent; (2) the accused inducer knowingly induced the infringing acts with a specific intent to encourage infringement by that person; and (3) there is underlying direct infringement by a third party. *See Commil USA, LLC v. Cisco Sys., Inc.,* 720 F.3d 1361, 1367 (Fed.Cir.2013); *Vita–Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1328 (Fed.Cir.2009); *see also* 35 U.S.C. § 271(b). Beyond its general challenge to the third prong for all types of indirect infringement, Google's motion specifically contends that Skyhook cannot prove that Google engaged in the second prong. To meet that intent element, "the inducer must have an affirmative intent to cause direct infringement." *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed.Cir. 2006) (en banc in relevant part). This means that "if an entity offers a product

with the object of promoting its use to infringe, as shown by clear expression or other affirmative steps taken to foster infringement, it is then liable for the resulting acts of infringement by third parties." *Id.* at 1305–06.

■■■■ Contrary to Google's argument that Skyhook cannot offer sufficient evidence for a reasonable juror to find that it induced infringement of the '219 patent, Skyhook's expert, Mr. James Geier, has offered ample opinions in his report in support of Skyhook's inducement claim. For example, he walks through the specific screens that Google's Android operating system shows an end user using Google Maps for Mobile that allegedly encourage them to use WiFi-based position estimates. Geier Rep. ¶¶ 108–14. Likewise, he points to specific statements that Google has issued to application developers encouraging them to include the allegedly infringing functionality in their mobile applications. *Id.* ¶ 115. He cites Google's own website, which says:

> Knowing where the user is allows your application to be smarter and deliver better information to the user. When developing a location-aware application for Android, you can utilize GPS and Android's Network Location Provider to acquire the user location. Although GPS is most accurate, it only works outdoors, it quickly consumes battery power, and doesn't return the location as quickly as users want. Android's Network Location Provider determines user location using cell tower and Wi–Fi signals, providing location information in a way that works indoors and outdoors, responds faster, and uses less battery power. To obtain the user location in your application, you can use both GPS and the Network Location Provider, or just one.

*Id.* And, with respect to both these groups and original equipment manufacturers, Skyhook has pointed to extensive documentary evidence suggesting Google's alleged intent to induce infringement in its contentions. Cherensky Decl. Ex. 14 at 15–36, 9097. In Appendix E of Mr. Geier's report, he explains why each of the screen prompts and statements in the documentary evidence allegedly encourage direct infringement of each of the asserted claims of the '219 patent by third parties. Viewed together, Mr. Geier's report and the documentary evidence cited by Skyhook is sufficient "[e]vidence of active steps ... taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use," to defeat Google's motion for summary judgment. *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1341 (Fed.Cir.2008) (quoting *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005)).

### 3. Contributory Infringement Under 35 U.S.C. § 271(c)

█ Section 271(c) of the Patent Act provides a claim for infringement against "[w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process." 35 U.S.C. § 271(c). "To establish contributory infringement, the patent owner must show the following elements ...: 1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial non-infringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed.Cir.2010). In its summary judgment motion, Google only appears to contest the third element,[17] contending that Skyhook cannot prove contributory infringement because Google's products have substantial non-infringing uses. The parties' dispute reduces to whether the "component" is the entire Android open source and NLP code (i.e., the Android operating system) or the "location injection functionality or the location injection functionality in conjunction with NLP." If the former, then Google prevails because the entire operating system has substantial non-infringing uses. If the latter, I must consider whether the location injection functionality or the location injection functionality in conjunction with NLP has substantial non-infringing uses.

**17.** In a footnote, Google also contends that Skyhook's expert has offered no opinion on the other elements, entitling Google to summary judgment. Mem. in Support of Mot. at 13 n.6. As I explained above, Skyhook has offered sufficient evidence, at this stage, to defeat Google's motion with respect to no direct infringement. As to Google's knowledge of the patent, the failure of Skyhook's expert to opine on this issue does not entitle Google to summary judgment, as this does not appear to be an issue that requires expert testimony. Skyhook points to documentary evidence relating to Google's knowledge of the patents, which is sufficient to survive summary judgment. Cherensky Decl., Exh. 14 at 15–36, 95–97. And because Google included the location injection functionality in the Android open source and NLP code (a point that the parties do not appear to dispute), a jury could reasonably conclude that Google intended end users of devices running its operating system to use the functionality and that the only intended use of the functionality infringed Skyhook's patent. As to materiality, Skyhook has offered expert opinions that Google supplies both the NLP functionality and the dedicated pipeline that is required for the Google NLP estimates to find their way to the Qualcomm chip, without which the accused products would not be able to practice the invention. *See, e.g.,* Geier Decl., Ex. A, App. E, ¶¶ 42, 44. This is sufficient to survive Google's motion.

Software may be a "component" under section 271(c). *See, e.g., Robocast, Inc., v. Microsoft Corp.,* 21 F.Supp.3d 320, 331–32 (D.Del.2014); *i4i Ltd. Partnership v. Microsoft Corp.,* 670 F.Supp.2d 568, 580 (E.D.Tex.2009), *aff'd,* 598 F.3d 831, 849 (Fed.Cir.2010). Software programs may be made up of smaller software units though, each of which may also be a "component" under the statute. *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1320 (Fed.Cir.2009) (concluding that proper "component" for contributory infringement analysis was the date picker feature in Microsoft Outlook, not Microsoft Outlook as a whole). According to the Federal Circuit, "an infringer 'should not be permitted to escape liability as a contributory infringer merely by embedding [the infringing apparatus] in a larger product with some additional, separable feature before importing and selling it.' " *Id.* (quoting *Ricoh Co. v. Quanta Computer Inc.,* 550 F.3d 1325, 1337 (Fed.Cir.2008)).

■■■ Here, the component of the patented system that Google provides is the computer code that allows a device to collect a WiFi-based position estimate (and an uncertainty estimate) and pass that information to a satellite position module, i.e., the location injection functionality in conjunction with NLP. This functionality is "separate and distinct" from other features in the Android operating system and must be "treat[ed] ... separately in analyzing contributory infringement." *Fujitsu Ltd. v. Netgear Inc.,* 620 F.3d 1321, 1331 (Fed. Cir.2010). Inclusion of this code within a larger program, the Android operating system, does not change the component's ability to infringe. Moreover, based on the expert reports that Skyhook has submitted and the expert testimony that it intends to offer, a reasonable juror could conclude that this component is suitable only for an infringing use.

Google raises two arguments to suggest that Skyhook cannot, as a matter of law, prove that the accused functionality has no substantial non-infringing uses: that NLP may provide the SPS with a cell-ID-based position estimate instead of a WiFi-based position estimate, and that NLP can provide position information to the user with the GPS function turned off. The first argument fails because the infringing component is the code that passes the WiFi-based position estimate to the SPS unit; whether additional code exists in the operating system for determining a position estimate in other ways is irrelevant. The second fails because simply being able to turn off an infringing feature does not give that feature a non-infringing use. *See Fujitsu Ltd.,* 620 F.3d at 1331 ("Whether a user [turns an infringing component on or off] is relevant to the extent of direct infringement, but does not establish substantial noninfringing uses.").

## VI. Google's Motion for Summary Judgment of Non–Infringement of the '694, '657, and '897 Patents (Docket # 465)

### A. The '694, '657, and '897 Patents

Google moves for summary judgment of non-infringement on all of the asserted claims of the '694, '657, and '897 patents. The '694 and '657 patents, which are in the same family, claim a "database" (called a "collection of information" in the '657 patent) that stores the estimated locations, or "calculated position information," for WiFi APs. Although the '694 patent claims only the database, the '657 patent claims a system comprising the database and the server that hosts it. Claim 1 of the '694 patent, for example, is:

A database of Wi–Fi access points for at least one target area having a radius on the order of tens of miles, said database being recorded in a computer-readable

medium and including database records for substantially all Wi–Fi access points in the target area, each record including identification information for a corresponding Wi–Fi access point and calculated position information for the corresponding Wi–Fi access point, wherein said calculated position information is obtained from recording multiple readings of the Wi–Fi access point at different locations around the Wi–Fi access point so that the multiple readings avoid arterial bias in the calculated position information of the Wi–Fi access point, and wherein the database records for substantially all Wi–Fi access points in the target area provide reference symmetry within the target area.

'694 patent, claim 1. Likewise, claim 1 of the '657 patent is:

A Wi–Fi location server system, comprising:

a collection of information in a non-transitory computer-readable medium describing Wi–Fi access points for at least one target area, the collection including information for a plurality of Wi–Fi access points in the target area, the information including identification information for a corresponding Wi–Fi access point and calculated position information for the corresponding Wi–Fi access point, wherein the calculated position information is obtained from recording multiple readings of the Wi–Fi access point at different locations around the Wi–Fi access point so that the calculation of the position of the Wi–Fi access point reduces arterial bias in the calculated position information;

computer-implemented logic for receiving sets of newly-discovered readings for Wi–Fi access points in the target area and location information representing one or more locations at which any of the newly-discovered readings were detected;

computer-implemented logic for identifying potential error in the location information including grouping readings into subsets, assigning one or more attributes to each subset, comparing attributes of at least two subsets, and identifying the potential error in the location information based on results of the comparing; and

computer-implemented logic to determine position information for Wi–Fi access points based on the multiple readings of the Wi–Fi access point at different locations around the Wi–Fi access point and the location information representing one or more locations at which any of the multiple readings were detected, wherein the location information with potential error is excluded.

'657 patent, claim 1.

The '897 patent claims a method of locating a WiFi-enabled device based on the "recorded location information" for each AP within range of the device. To do so, the device first accesses "a reference database" that stores each AP's "recorded location information," which the '897 patent's specification describes as synonymous with "calculated position information." Claim 1 is illustrative:

In a location-based services system for WiFi-enabled devices, a method of calculating the position of WiFi-enabled devices comprising the acts of:

a) a WiFi-enabled device communicating with WiFi access points within range of the WiFi-enabled device so that observed WiFi access points identify themselves;

b) accessing a reference database to obtain information specifying a recorded location for each observed WiFi access point;

c) using the recorded location information for each of the observed WiFi access points in conjunction with predefined rules to determine whether an observed WiFi access point should be included or excluded from a set of WiFi access points;

d) using the recorded location information of only the WiFi access points included in the set and omitting the recorded location information of the excluded WiFi access points to calculate the geographical position of the WiFi-enabled device.

'897 patent, claim 1.

## B. The Accused Instrumentalities

Skyhook accuses Google's WiFi AP Table as the infringing instrumentality that satisfies the '694 patent's "database of Wi–Fi access points" requirement, the '657 patent's "collection of information in a non-transitory computer-readable medium describing Wi–Fi access points" requirement, and the '897 patent's "reference database" requirement.[18]

The WiFi AP Table is a large store of information about APs across the globe. At a high level of generality, the WiFi AP Table is organized by column and row, like a spreadsheet. Each row in the WiFi AP Table corresponds to a single AP, which is identified by its unique media access control ("MAC") address, such as 00–18–84–12–01–FD. Each row has many columns, one of which contains an estimated location for each AP, represented as a latitude and longitude. This column may facilitate organization by geographic region, but the WiFi AP Table is not organized or otherwise defined with reference to geographical region, does not contain any rows or columns to facilitate such organization, and does not indicate how AP information was collected. Google contends, and Skyhook does not dispute, that the WiFi AP Table does not contain information on all APs.

Google has used two collection methods to generate data for the WiFi AP Table. First, Google's CityBlock collection model, which accounted for at least some data in the WiFi AP Table from 2007 through March 2012, used vehicles equipped with scanning equipment to collect AP information. Second, Google's crowdsourced [19] collection model, which it started including in the WiFi AP Table in 2008 and which has been the sole source of data in the WiFi AP Table since March 2012, is designed to collect AP information from mobile device users, for example, as they walk or drive around a city. It is undisputed that, with respect to individual users, Google does not control how or where the mobile device users travel and Google does not take any steps to ensure that they travel particular routes or in particular areas. Docket # 491 at 11 (Skyhook Resp. to Statement of Undisputed Facts). The parties appear to agree that between 2008 and 2012 Google's WiFi AP Table included data from both the CityBlock and crowdsourcing collection methods.[20]

---

18. With respect to the '897 patent, Skyhook also accuses the reference database located in the local cache of an Android device.

19. Generally speaking, "crowdsourcing" is a process of obtaining information by soliciting contributions from a large group of people— in this case, users of mobile devices, like phones, running certain versions of Google's Android operating system.

20. Skyhook contends that it would not have been possible for Google to launch the crowdsourced-only WiFi AP Table without the CityBlock data collections. Nonetheless, Skyhook does not appear to dispute that, at some point, there existed (1) a WiFi AP Table with data from only CityBlock collections, (2) a WiFi AP Table with data from both the crowdsourced model and CityBlock collec-

## C. Analysis

Google's motion raises four conceptually distinct non-infringement arguments. First, Google contends that its WiFi AP Table with crowdsourced data does not infringe any of the asserted claims of the three patents because its collection does not "cover every street," which it contends is required by my constructions of "calculated position information" ('694 and '657 patents) and "recorded location information" ('897 patent). Second, it contends that no version of its WiFi AP Table infringes the asserted claims of the '694 and '657 patents because Google did not pre-identify geographic areas for data collection, which Google contends is required by my construction of "target area." Third, Google argues that no version of its WiFi AP Table infringes the asserted claims of the '897 patent because the tables do not contain data on all WiFi access points, making it impossible for the WiFi AP Tables to provide "information specifying a recorded location for *each* observed WiFi access point" as the claims require. Finally, Google contends that, for a number of reasons, it does not indirectly infringe any of the asserted claims of any of the three patents.

### 1. "[calculated position/recorded location] information"

In my 2012 claim construction order, I construed "calculated position information" in the '694 patent and "recorded location information" in the '897 patent to mean "estimated physical location(s) of Wi-Fi access points calculated using characteristics of signals transmitted by such Wi-Fi access points, which Wi-Fi access points have been collected systematically, i.e., in a manner in which all the streets in a target

area are covered." Docket # 96 at 14. Similarly, in my 2014 claim construction order, I construed "calculated position information" in the '657 patent to mean "position information obtained from recording multiple readings of the Wi-Fi access point at different locations around the Wi-Fi access point so that the calculation reduces arterial bias." Docket # 339 at 26. Google contends that it cannot infringe any of the three patents, either literally or under the doctrine of equivalents, because its crowdsourced data collection method is not "systematic" and does not "cover every street," which it says is required by my constructions.[21]

Google's motion turns on the scope of Skyhook's disavowal of random models of collection. In my first claim construction order, I concluded that Skyhook disavowed data collection models that suffered from arterial bias and instead claimed models that avoid arterial bias, like where "the data set [is] collected [by] driv[ing] 'every single street in the target area.'" Docket # 96 at 15–16 (quoting '988 patent at 8:29); *see also* '694 patent at 7:48; '657 patent at 8:41. Applying that conclusion to the examples given in the specifications, I concluded that Skyhook disavowed a specific model that it called the "Random Model." The patents defined the Random Model as follows:

> One approach, known as the Random Model, places scanning devices in vehicles as they are conducting daily activities for business or personal use. These vehicles could be delivery trucks, taxi cabs, traveling salesman or just hobbyists. The concept is that over time these vehicles will cover enough streets in their own random fashion in order to build a reliable reference database. The

---

tions, and (3) a WiFi AP Table with data from only the crowdsourced model.

**21.** Google does not move for summary judgment of non-infringement on this theory with respect to its CityBlock data.

model does in fact provide a simple means to collect data but the quality of the resulting data is negatively affected due to issues of "arterial bias". '694 patent at 7:7–15; '657 patent at 7:67–8:8. I determined that Skyhook disclaimed the Random Model because it was expressly defined in the specification as suffering from arterial bias. I likewise concluded that Skyhook did not disclaim another example given in the patents, the Chinese Postman algorithm, because that model was expressly defined as "covering every single street in the target area." '694 patent at 7:53; '657 patent at 8:46. Yet, I noted that the claims included more than just data collected according to the Chinese Postman algorithm because "the patent does not clearly disavow or exclude other routing algorithms that include every street in the target area." Docket # 96 at 17.

Skyhook alleges that, unlike the Random Model defined in the specifications, "[t]he sheer number of deployed Android devices [used for Google's crowdsourced collection model] ensures that those devices will cover every street." Docket # 490 at 10. Skyhook's experts have offered opinions on this extensive coverage in both their reports and deposition testimony. *See, e.g.,* Geier Report, App. A, ¶¶ 48, 64, figs. 1018. Skyhook also points to deposition testimony from a Google fact witness apparently conceding that Google's crowdsourced collection model does not suffer from arterial bias. *See* Opp. at 10–11. Skyhook has therefore shown that a genuine issue of material fact exists as to whether Google's crowdsourced collection model covers every street within each target area, which is sufficient to preclude summary judgment on this theory.

Beyond covering every street in a target area, Google contends that collecting AP information "systematically"—as required by my construction—requires a "planned audit." This argument suggests that the claims require some degree of order in the collection, such that a random collection method, like the Google crowdsourced model, can never infringe. I find no support for this theory in either the patents or my previous orders. As my construction of "[calculated position/recorded location] information" makes clear, "systematically" means "in a manner in which all the streets in a target area are covered." Docket # 96 at 14. It does not limit how all of the streets in a target area must be covered–just that they be covered. My reference to a "planned audit" simply referred to the "target area" limitation in the claims. "Planned audit" does not appear in the patents, but rather comes from the prosecution history of U.S. Patent No. 7,414,988, which is the parent of the '657 patent.[22] In a reply to a non-final office action, Skyhook described the "advantages of the solutions devised by applicants" as being that "[n]amely, by performing a planned audit, *and* avoiding arterial bias, applicants at least achieve more complete information about access points in the target area, higher quality estimates of access point locations, and reference symmetry." Docket # 46-1 at 16 (emphasis added). The "planned audit" term is therefore distinct from "avoiding arterial bias," which is the defining criterion for the collection method limitation.

Finally, Google asserts that the doctrine of equivalents, which allows the accused element to be "insubstantially different" from the claimed element, *see Warner– Jenkinson Co. v. Hilton Davis Chem. Co.,*

___

22. U.S. Patent No. 7,414,988 claims priority to the same provisional application as both the '694 patent and the '897 patent.

520 U.S. 17, 37–40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), cannot be a backup argument to Skyhook's literal infringement position because Skyhook's expert, Mr. Geier, offered insufficient opinions on it. However, with respect to the "calculated position information" limitation, Mr. Geier wrote, in his report, that "[t]o the extent that this limitation is not found to be met literally, it is my opinion that it is met under the Doctrine of Equivalents." Geier Report, App. A ¶ 76. He explained that this opinion is based on "test results[, which] confirm that Google's collection from user devices is not substantially different from its CityBlock collection, and therefore not substantially different from driving every street if driving every street is required." *Id.* According to Mr. Geier, the reason the collection methods are not substantially different is that "[b]oth methods collect location information about Wi–Fi access points through the use of scanners, both calculate positions of the access points based on information from the scanners, and there [is] 'almost no difference' in results." *Id.* These opinions, coupled with Mr. Geier's recitation of the legal standard for infringement under the doctrine of equivalents in the main body of his report, *id.* ¶¶ 26–27, are sufficient to enable a reasonable juror, taking all the evidence in the light most favorable to Skyhook, to find that Google's crowdsourced collection model infringes these three patents under the doctrine of equivalents.

Accordingly, Google's motion for summary judgment of non-infringement is denied.

### 2. "target area"

Google also moves for summary judgment of non-infringement of the '694 and '657 patents based on my construction of "target area" in those patents' asserted claims. In my 2012 claim construction order, I construed "target area" to be "a pre-identified geographic area." According to Google, it cannot infringe the asserted claims because neither method that it uses to collect AP location data, the CityBlock model or the crowdsourced model, is based on "pre-identified geographic areas."

 With respect to the crowdsourced collection model, Skyhook contends that the target areas are cities and metro area, Geier Rep.App. A ¶ 36, since the crowdsourced model resulted in full coverage for these areas shortly after its launch, *id.* ¶ 33. Although this may be true—and I assume that it is for the purposes of this summary judgment motion—it is insufficient to meet the "target area" limitation. Skyhook does not allege that Google took any affirmative action to "pre-identify" the cities and metro areas that were fully covered after the crowdsourced model's launch.[23] As I explained in my claim construction ruling, a "pre-identified" area is one that is "identified in advance of the scanning." Docket # 96 at 8. Because Skyhook has offered neither allegations

---

**23.** To the extent that Skyhook argues that Google may infringe some of the claims because it identified the United States or the globe as a target area, this argument fails. To construe "target area" so broadly would render the claim term essentially meaningless. In my claim construction order, I noted that the specifications explain that "[t]he target scan areas typically represent a large metropolitan area including every single drivable street in [a] 15–20 mile radius." *See, e.g.,* '694 patent at 6:61–63. I did not determine what the upper bound on the size of a

"target area" may be, but I need not do so to allow Google's motion. *See, e.g., Abbott Labs. v. Baxter Pharm. Prods., Inc.,* 471 F.3d 1363, 1368 (Fed.Cir.2006) (ruling that district court did not have to provide "numerical exactitude" on construction of disputed claim term where any added precision was not necessary to resolve the invalidity question). An area as large as the United States or the globe is certainly larger than what a person of ordinary skill would understand "target area" to mean, in light of the patents' specifications.

nor evidence suggesting that Google affirmatively acted to identify a geographic area for scanning before that scanning began, Google's motion is granted with respect to its crowdsourced-only database.[24]

■ With respect to the CityBlock collection model, Skyhook alleges, and cites deposition testimony to support, that CityBlock drivers were assigned "designated areas," like cities or metropolitan areas, to scan. Google does not contest that it pre-identified at least some of these areas. Rather, it contends that these areas, which it calls "deployment regions," were too amorphous and ill-defined to be "pre-identified geographic areas." Whether the "designated areas" or "deployment regions" were sufficiently identified by Google in advance of scanning is a genuine dispute of material fact. I conclude that Skyhook's allegations and supporting evidence are sufficient to enable a reasonable juror, taking all the evidence in the light most favorable to Skyhook, to find that Google's WiFi AP Table containing CityBlock collection data infringes the '694 and '657 patents.

The parties do not brief the significance for the summary judgment motion of the mixing of data from the two collection methods in the WiFi AP Table from 2008 to 2012. Based on the evidence and arguments before me, I cannot now conclude that Google is entitled to summary judgment of non-infringement for the period in which it operated the mixed-source WiFi AP Table. Its motion with respect to alleged acts of infringement before it removed all information derived from CityBlock collection from its WiFi AP Table in March 2012 is denied.

### 3. "each observed WiFi access point"

The asserted claims of the '897 patent recite a "method of calculating the position of WiFi-enabled devices comprising the acts of . . . accessing a reference database to obtain information specifying a recorded location for each observed WiFi access point." According to Google, it cannot infringe these claims because its database, the WiFi AP Table, is not comprehensive (i.e., it does not have data for each WiFi access point that might be observed). Skyhook counters that although the claim requires that each observed AP in a particular execution of the method be in the database, it does not require that all APs that could conceivably be observed are in the database. In Skyhook's view, it is sufficient to show infringement if the method steps are executed and, for that particular execution, the database contains location information for each AP that was observed in the earlier steps. The actual disputed issue is therefore whether "each observed access point" means each access point within range of the WiFi-enabled device that is observed by and identified to the WiFi-enabled device as the claim says (Skyhook's position) or whether it means "all APs everywhere" (Google's position).

■ The claims do not require that the database be comprehensive. It is sufficient to establish infringement of the method claims if, in a particular instances, the database contains location information for each observed access point. Skyhook contends that at any given time it is very

**24.** Skyhook also offers no allegations or evidence suggesting that Google did something equivalent to the claim element requiring pre-identification of a geographic area. Without "particularized testimony and linking arguments as to the insubstantiality of the differences between the claimed invention and the accused device or process . . . on a limitation by limitation basis," *Tex. Instruments Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1567 (Fed.Cir.1996), Skyhook's doctrine of equivalents argument with respect to the crowdsourced-only WiFi AP Table fails.

likely that the few active APs that are within range of a particular WiFi-enabled device are all among the hundreds of millions of WiFi APs that are in Google's WiFi AP Table. Although Google disputes the frequency with which this will be true, it does not dispute that there are at least some (and likely many) instance in which it is. Thus, genuine issues of material fact exist with respect to its infringement of the '897 patent.

Skyhook, in its opposition to Google's motion, contends that the frequency with which Google's method infringes is one of damages. On that point, I disagree. Establishing infringement of a method patent, like the '897 patent, requires evidence that each step in the method is actually carried out. *See, e.g., Limelight Networks, Inc.,* 134 S.Ct. at 2117 ("[T]he patent is not infringed unless all the steps are carried out."). Skyhook must therefore prove that there are at least some instances in which Google's method performs each step claimed in its patent, including "obtain[ing] information … for each observed WiFi access point," in order to establish liability. Yet, "[a] patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.,* 579 F.3d 1363, 1372 (Fed.Cir.2009) (internal quotation marks and citations omitted). Skyhook has pointed to sufficient circumstantial evidence of infringement to survive summary judgment (e.g., deposition testimony of Google's expert, Dr. Walker).

#### 4. Indirect Infringement

 As with the '219 patent, Google contends that Skyhook has not offered sufficient evidence of direct infringement to support a claim for indirect infringement. First, Skyhook's expert, Mr. Geier, has offered sufficient opinions in his report to allow a reasonable juror to conclude that end users directly infringe the asserted claims. To the extent that he does not offer evidence of individual acts of infringement but instead relies on inferences from usage data, Mr. Geier's report offers sufficient circumstantial evidence from which a reasonable juror could conclude that end users infringe. Second, with respect to the claims that cover only the WiFi AP Table (as opposed to method claims that involve accessing it), Skyhook has produced sufficient evidence to allow a reasonable jury to conclude that Google directly infringes the asserted claims, including a lengthy analysis from Mr. Geier about how Google's WiFi AP Table infringes the asserted claims of the '694 and '657 patents. Third, as to the '897 patent, Mr. Geier has conducted a sufficient analysis concluding that the relevant components of NLP, including WifiLocator.java, WifiLocationEstimator.java, and MaxLreLocalizer.java, have no substantial non-infringing uses. Google's motion with respect to indirect infringement of the asserted claims is therefore denied.

### VII. Google's Motion for Summary Judgment of Non–Infringement of the '234 Patent (Docket # 463)

Google finally moves for summary judgment of non-infringement on all asserted claims of the '234 patent. The '234 patent describes a system and method for estimating an expected error of a position estimate in a WiFi-based positioning system. Claim 1 is illustrative:

In a Wireless Local Area Network (WLAN) positioning system for estimating the position of a WLAN-enabled device, a method of estimating an expected error of a position estimate, a method comprising:

the WLAN-enabled device receiving signals transmitted by at least one WLAN

access point in range of the WLAN-enabled device;

estimating the position of the WLAN-enabled device based on the received signals from the at least one WLAN access point in range of the WLAN enabled device; and

estimating an expected error, in terms of distance, of the position estimate based on characteristics of the at least one WLAN access point used for estimating the position of the WLAN-enabled device, wherein the expected error predicts a relative accuracy of the position estimate in terms of distance.

I construed "relative accuracy of the position estimate in terms of distance," which appears in the final "wherein" clause of the claims, to mean "the distance between the position estimate and the actual position, divided by the distance between a reference point and the actual position." Docket # 526 at 4. I also construed "expected error [of a position estimate]" to mean "a prediction of the relative accuracy in terms of distance, based on characteristics of the at least one access point used to estimate the position of the WLAN-enabed device." Docket # 339 at 12–13.

▇▇▇ Skyhook accuses various mobile devices running the Android mobile platform and NLP code as infringing the '234 Patent.[25] Google contends, however, that none of the NLP algorithms uses the "the expected error" to "predict[ ] a relative accuracy of the position estimate in terms of distance," so it cannot infringe the claims. Its argument is predicated on the claim phrase containing this language— "wherein the expected error predicts a relative accuracy of the position estimate in terms of distance"—being a claim limi-

tation. Because I conclude that it is not, Google's motion is denied.

▇▇▇ When a "whereby" clause contains mere "laudatory" terms "characterizing the result of the executing step," the clause is not limiting. *Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1381 (Fed.Cir.2003); *see also Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed.Cir.2003) ("[A] whereby clause that merely states the result of the limitations in the claim adds nothing to the substance of the claim"). But, when the "whereby" clause "states a condition that is material to patentability, it cannot be ignored in order to change the substance of the invention." *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed. Cir.2005). This same reasoning applies to "wherein" clauses like the one at issue here. *See, e.g.*, Manual of Patent Examining Procedure § 2111.04 (9th ed.2014); *Prometheus Labs. Inc. v. Roxane Labs., Inc.*, No. 11–cv–1241 FSH, 2013 WL 5333033, at *5 & n. 7 (D.N.J. Sept. 23, 2013). Determining which category a particular "wherein" clause falls into is a "fact-specific" inquiry that turns on all of the contextual clues that courts normally look to in claim construction. *See Griffin v. Bertina*, 285 F.3d 1029, 1034 (Fed.Cir. 2002). For example, if the prosecution history reveals that the "wherein" clause was required by the patent examiner as a condition of patentability, the clause will be viewed as an affirmative limitation. *See Desenberg v. Google, Inc.*, 392 Fed.Appx. 868, 871 (Fed.Cir.2010).

The last step of the claimed method is "estimating an expected error, in terms of distance" of a device position estimate. As I explained in my last claim construction order, a relative accuracy of a device posi-

---

**25.** Specifically, Skyhook accuses Google and non-Google Android devices, Android's and NLP's operation on non-Google devices, and Google Android devices accessing Google Location Server.

tion estimate can necessarily be expressed as the expected error of that position estimate divided by the distance from a reference point to the actual position of the device. Given an expected error of a position estimate in terms of distance, one can always generate a relative accuracy of that position estimate in terms of distance, regardless of whether the distance from the reference point to the actual position of the device is known. *See* Docket # 596 at 8. The "wherein" clause within the last step of the claimed method therefore states a mathematical truth about the expected error. This is a quintessential example of language "characterizing the result of the executing step." *Minton*, 336 F.3d at 1381.

The prosecution history is not to the contrary.[26] As Google noted at the hearing on its motion, Skyhook modified the language of the "wherein" clause in response to an initial rejection of the now-asserted claims by the patent examiner. The last step of the claimed method originally was "estimating an expected error of the position estimate based on characteristics of the WLAN access point in range of the WLAN enabled device, wherein the expected error predicts a relative accuracy of the position estimate." Claim 1, Jan. 22, 2007 Application. The examiner initially concluded that U.S. Patent Application Publication No.2007/0121560 ("Edge") anticipated the claim because it taught a WLAN-enabled device "estimating location reliability for any terminal whose location is determined using access point locations

that may be unreliable." Jan. 11, 2010 Non–Final Rejection at 2. According to the examiner, that feature of Edge taught the entire last step of the claimed method, including the wherein clause. In response, Skyhook amended its claims as follows:

> estimating an expected error, *in terms of distance,* of the position estimate based on characteristics of the *at least one* WLAN access point *used for estimating the position of the WLAN-enabled device,* wherein the expected error predicts a relative accuracy of the position estimate *in terms of distance.*

Claim 1, June 15, 2010 Claims. Skyhook explained that it amended the claims because

> Edge does not disclose estimating an expected error of a position estimate *in terms of distance* that predicts a relative accuracy of the position estimate *in terms of distance.* Rather, Edge discloses estimating the reliability of a particular location estimate based on the reliability of the access points underlying the location estimate. This reliability estimate does not provide the relative accuracy of the position estimate *in terms of distance.* Instead, it merely provides the probability that the location estimate given is either correct or incorrect.

June 15, 2010 Applicant Remarks at 8. With this amendment, the examiner concluded that the claimed method was "neither taught nor suggested by the prior

---

26. Google presented several slides about the '234 patent's prosecution history at the hearing, but the prosecution history is not in the record. Because "the prosecution history is a public record that is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,'" *Iconfind, Inc. v. Google, Inc.*, No. 2:11–CV–0319–GEB–JFM, 2012 WL 158366,

at *1 (E.D.Cal. Jan. 18, 2012) (quoting Fed. R.Evid. 201), I take judicial notice of it. Specifically, I rely on the "Image File Wrapper" associated with United States Patent Application No. 11/625,450 in the Patent and Trademark Office's Patent Application Information Retrieval Database (available at http://portal. uspto.gov/pair/PublicPair).

art." Nov. 10, 2010 Notice of Allowability.[27]

The examiner's rejection and Skyhook's amendment were therefore focused on getting around what Edge disclosed about the "estimating" step. To exclude the probability-based Edge method from its claims, Skyhook limited its method to one in which the expected error is estimated "in terms of distance," not probability. This required change had consequences for the wherein clause. As explained in my last claim construction order (Docket # 526), the relative accuracy of the position estimate is the measurement error in the position estimate relative to the actual position. These quantities must be measured in the same way—if one can be expressed only in distance, the other can be expressed only in distance. Skyhook's amendment to the "wherein" clause was therefore incidental to the required amendment to the "estimating an expected error" term. The amendment to the "wherein" clause itself was not required as a condition of patentability.

The prosecution history not only shows that the amendment to the "wherein" clause was not required as a condition of patentability, but also confirms that my reading of the "wherein" clause as showing the result of "estimating the expected error" is correct. Skyhook, in its remarks with the amendment, explains that it understands the claim to require the expected error to *provide* the relative accuracy of the position estimate in terms of distance." June 15, 2010 Applicant Remarks at 8 (emphasis changed). This is consistent with my construction, which holds that relative accuracy necessarily follows from expected error. The "wherein"

clause, which merely states this relationship, is not a separate limitation that requires a calculation.

Based on the structure of the claims, the specification, and the prosecution history, I conclude that the "wherein" clause "merely states the result of the limitations in the claim [and] adds nothing to the substance of the claim." *Lockheed Martin Corp.*, 324 F.3d at 1319. It therefore is not a claim limitation. Google's motion (Docket # 463) for summary judgment of non-infringement, which is premised on it not performing the calculation described in the wherein clause, is denied.

## VIII. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Google's Motion for Summary Judgment of Invalidity for Indefiniteness of the '454, '074, and '960 Patents (Docket # 466) is DENIED.

2. Summary judgment in favor of Skyhook that the asserted claims of the '454, '074, and '960 Patents are not indefinite is GRANTED.

3. Google's Motion for Summary Judgment of Non–Infringement of the '454, '074, and '960 Patents (Docket # 464) is DENIED.

4. Google's Motion for Summary Judgment of Non–Infringement of the '219 Patent (Docket # 462) is DENIED.

5. Google's Motion for Summary Judgment of Non–Infringement of the '694, '657, and '897 Patents (Docket # 465) is ALLOWED IN PART and DENIED IN PART.

**27.** The PTO rejected the claim a second time before issuing the notice of allowance, but withdrew the objection in response to Skyhook's argument that it misinterpreted the law. Skyhook did not amend the claims during this second exchange. *See* Aug. 20, 2010 Final Rejection at 2; Oct. 26, 2010 Applicant Remarks at 7–8.

6. Google's Motion for Summary Judgment of Non–Infringement of the '234 Patent (Docket # 463) is DENIED.